JESKE, Respondent, vs. GENERAL ACCIDENT FIRE & LIFE ASSURANCE CORPORATION, LTD., Appellant.

*April 12—May 7, 1957.*

78

For the appellant there was a brief by *Benton, Bosser, Fulton, Menn & Nehs* of Appleton, and oral argument by *David L. Fulton.*

For the respondent there was a brief by *Keefe, Patri, Stillman & Nolan*, and oral argument by *William E. Crane*, all of Oshkosh.

STEINLE, J. It is the position of General Accident Fire & Life Assurance Corporation, Ltd., the defendant, that (1) there is no support in the evidence for the trial court's judgment of reformation; (2) the defendant is entitled to reformation; (3) the plaintiff may not recover on any theory of estoppel; and (4) the defendant did not waive its rights by its own conduct after the loss occurred.

With reference to the first of these contentions, it is to be observed, that to justify reformation the evidence must be clear and convincing that both parties intended to make a different instrument, and must clearly show that both had agreed upon facts which were different than those set forth in the instrument. *Kadow v. Aluminum Specialty Co.* (1948), 253 Wis. 76, 78, 33 N. W. (2d) 236. Where refor-

mation is sought, a distinction is made between ordinary contracts and contracts of insurance, and less is required in cases dealing with the latter. See *Center Street Fuel Co. v. Hanover Fire Ins. Co.* (1956), 272 Wis. 370, 373, 75 N. W. (2d) 462. Presented under the first point of challenge, therefore, is the question whether the record contains clear and satisfactory evidence that both parties intended property-damage coverage within the limits of the insurance policy for the hazards involved in the demolition of the city of Green Bay's building by the plaintiff.

In the record there is evidence which the trial court was entitled to deem credible that the plaintiff, A. W. Jeske, over a period of about twenty years before December 31, 1953, had been well acquainted with and was an insurance customer of A. J. Klawun of the Kirst-Klawun Insurance Agency of Oshkosh. Throughout that time the plaintiff had been engaged in the business of general contracting. In 1943 he purchased a moving company, and from then on he engaged to some extent in house wrecking and demolition operations, although his business remained predominately that of construction. It was customary for Klawun to call at the office of Jeske once or twice a week for the purpose of discussing insurance needs and taking care of the details of providing the same. Klawun was a general agent of the defendant Insurance Company. For about eighteen or twenty years previous to December 31, 1953, the defendant, through Klawun, issued to Jeske annually a policy designated as a manufacturers' and contractors' schedule liability policy. The name assureds were A. W. Jeske Construction Company, Incorporated, and A. W. Jeske, individually, whose business was described as "contractor." Shortly before December 31, 1953, Klawun delivered to Jeske a renewal of the policy which was to remain in effect for a year ending December 31, 1954. The policy, in so far as material, provided for bodily injury liability coverage of $25,000 for each person and

$50,000 for each accident, and property-damage-liability coverage with limits of $5,000 for each accident and $25,000 aggregate property-damage liability, the same being scheduled as "Premises—Operations Hazards" and which covered risks at 265 Oak street, Oshkosh. Attached to the policy was a rider denominated "Extension Schedule" which afforded the same limits of coverage at places other than 265 Oak street, Oshkosh, and which included in its description of operations the following: "Classification No. 3451S:"— "Outside Building—Raising or Moving—Including Incidental Shoring, Removal or Rebuilding of Walls, Foundations, Columns or Piers." The "Extension Schedule" contained the applicable rate of premiums based upon pay roll. At the foot of the "Extension Schedule" appeared the following: "Exclusion (i) applies to classifications as follows: 3451S;" "Exclusion (j) applies to classifications as follows: 3451S." Printed in the body of the policy were the following exclusions:

"(Exclusion) (h) under coverage B, with respect to division 1 of the definition of hazards, in so far as said division applies to operations stated in the declarations as subject to this exclusion or operations not stated therein which are subject to this exclusion in the company's manual, to injury to or destruction of property arising out of (1) blasting or explosion, other than the explosion of air or steam vessels, piping under pressure, prime movers, machinery or power-transmitting equipment, or (2) the collapse of or structural injury to any building or structure due (a) to excavation (including borrowing, filling or backfilling in connection therewith), tunneling, pile driving, cofferdam work or caisson work, or (b) to moving, shoring, underpinning, raising, or demolition of any building or structure or removal or rebuilding of any structural support thereof;

"(Exclusion) (i) under coverage B, with respect to division 1 of the definition of hazards, to injury to or destruction of wires, conduits, pipes, mains, sewers, or other similar property, or any apparatus in connection therewith, below

the surface of the ground, arising out of operations stated in the declarations as subject to this exclusion or out of operations not described therein which are subject to this exclusion in the company's manual, if such injury or destruction is caused by and occurs during the use of mechanical equipment for the purpose of excavating or drilling in streets or highways, or to injury to or destruction of property at any time resulting therefrom;"

Also attached to the policy appears an indorsement issued by the Kirst-Klawun Agency, Inc., which provides:

"In consideration of the property-damage rate expressed in the under-mentioned policy for classifications code 3451S, it is understood and agreed that:
"(1) Exclusion (i) applies to code 3451S.
"(2) Exclusion (j) applies to code 3451S."

It appears that exclusions (i) and (j) in the original indorsement on the plaintiff's 1953 policy were intended to read and refer to exclusions (h) and (i) of the policy. In January, 1954, the defendant executed and forwarded to its agent Klawun a corrected indorsement specifically designating the applicable exclusions as (h) and (i). The trial court determined that the corrected indorsement was never delivered to the plaintiff, and it appears that there is ample evidence to sustain such finding. The extension schedule attached to the policy contained no statement that any operations covered thereby were subject to exclusion (h), and no change was made in the extension schedule.

There was also competent evidence of record which the trial court was entitled to deem credible to the effect that during the latter part of January, 1954, the plaintiff, Jeske, learned through a trade journal that the city of Green Bay was soliciting bids for the razing of the city hall annex building in said city, which building had been damaged by fire. He went to Green Bay on February 3, 1954, examined the job, and obtained specifications for it. The specifications

required a performance bond, public-liability insurance with bodily injury liability coverage of $50,000 for each person and $200,000 for each accident, and property-damage-liability coverage of $10,000 for each accident. Jeske thereafter discussed the insurance requirements of the specifications with the defendant's agent, Klawun, and showed the specifications to Klawun before submitting his bid. On February 11, 1954, Jeske was at Green Bay for the opening of the bids and learned that his bid would be accepted. Upon his return to Oshkosh he notified Klawun that he would need insurance for the Green Bay job with the limits prescribed in the specifications. Klawun told Jeske that he would get the insurance for him. Klawun knew that the Green Bay operation was a wrecking job and telephoned to the defendant's Chicago office informing the defendant's representatives there that the operation was a wrecking job. On the same date Klawun wrote to the company requesting a certificate with the increased limits for the Green Bay job, and for any indorsement that might be needed. On February 12, 1954, the defendant's Chicago office informed Klawun that the company was unable to furnish a certificate of insurance for the increased limits requested, and that its top limit would be as shown in the existing policy. On February 15, 1954, Klawun issued a certificate of insurance certifying to the city of Green Bay that the plaintiff had an insurance policy in force with limits of liability for bodily injury of $25,000 and $50,000, and property damage of $5,000 and $25,000. Under the heading in the certificate "Description of Operations Covered" there appeared typewritten statements "General Contracting" and "ten days' notice to be given to the city of Green Bay in case of cancellation." At the foot of the certificate appeared the printed statement: "This certificate of insurance is issued subject to the exclusions, conditions, and other terms of the insurance afforded under the

policy or policies hereinbefore mentioned." Upon Klawun's suggestion, Jeske took the certificate of insurance together with his policy and a performance bond to Green Bay and presented the same to the city's officials for the purpose of ascertaining whether they would accept the policy with the lower limits as set forth in the certificate. The city officials declined to accept a policy with limits lower than those prescribed in the specifications. Jeske then telephoned to Klawun advising him that it would be necessary to have insurance with the increased limits. Klawun was unable to obtain the increased limits. He advised Jeske to such effect. However, Klawun did not inform Jeske that there was no coverage for property-damage liability within the limits of the insurance certificate which he had issued to the city of Green Bay for the wrecking job, nor did he ever inform Jeske that any property damage was excluded under the terms of the policy.

In connection with the demolition of the building at Green Bay, Jeske was required under the specifications to recap a portion of one wall which was to be left standing as a part of the adjoining building, and he was to close up the opening in the wall as well as to cap the pipes and conduits which came through the wall into the building to be wrecked. The filling of the doors and capping of conduits were all necessitated by the wrecking of the building and were a part of the contract, although only a small part thereof.

When Klawun was unable to provide the required increased limits, Jeske contacted E. Arthur Rehbein, an agent of the Paul Redemann Insurance Agency of Oshkosh to request the additional limits, informing him that the coverage was for the wrecking job at Green Bay, and providing him with a copy of the certificate of insurance which had been issued by Klawun. Rehbein arranged to provide excess public-liability and property-damage insurance by Lloyds of London through George F. Brown & Sons of Chicago. The policy specifically provided that:

". . . it is expressly agreed that liability shall attach to the underwriters only after the primary insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as follows:

". . . (b) Property Damage

"$5,000 ultimate net loss in respect of each accident,

"$25,000 ultimate net loss in the aggregate in any one period of insurance in respect of each hazard insured with an aggregate limit;

"(all hereinafter referred to as the 'Primary Limit or Limits') :

and the underwriters shall then be liable to pay only such additional amounts as will provide the assured with a total coverage under the policy/ies of the primary insurers and this insurance combined of . . .

"(b) Property Damage

"$10,000 ultimate net loss in respect of each accident but not exceeding

"$25,000 ultimate net loss in the aggregate in any one period of insurance in respect of each hazard insured with an aggregate limit under the underlying policy/ies."

Agent Rehbein contacted Gunnard Reynolds, a representative of the defendant, General Accident Fire & Life Assurance Corporation, Ltd., for information about the defendant company's policy. Thereafter Reynolds met with Rehbein, and Reynolds was given a copy of the excess-liability policy, which he examined.

Reynolds knew that the Green Bay job was a wrecking job, and knew that the excess-liability policy was issued to provide coverage for the work of dismantling the city hall annex. Reynolds notified the defendant company by letter that the Lloyds of London excess policy had been issued for the Green Bay wrecking job, and that the defendant company was named therein as the primary insurer.

Jeske presented the excess-coverage certificate to the officials of the city of Green Bay. He then commenced opera-

tions of dismantling the building. While in the process of taking down the east wall of the building on March 23, 1954, the wall buckled, causing it to fall upon an adjoining building owned by the city of Green Bay which resulted in damages that were stipulated at the trial to be $4,400. The defendant Insurance Company was advised of the accident, and after investigating the same, informed Jeske by registered letter on April 5, 1954, that demolition operations were specifically excluded from the policy, and that the defendant disclaimed coverage for the damages arising out of the accident. This notice was the first that Jeske had that there was an exclusion in the policy in connection with demolition operations. Jeske adjusted and settled the damage claim with the city of Green Bay for $4,400. At the trial Jeske stated that he had never read the exclusions in the insurance policy, and that as to coverage afforded, he "figured" that his insurance agent, Klawun, would protect him.

On April 9, 1954, the defendant's Chicago office advised Jeske by telephone that he could complete the Green Bay wrecking job under the present coverage afforded to him by the defendant before more coverage was arranged for the wrecking and house-moving operations. Such advice to Jeske was also confirmed by the defendant in a letter to him dated April 9, 1954.

On April 13, 1954, new coverage was arranged and Jeske canceled the policy issued to him by the defendant. In June, 1954, the defendant made an audit of Jeske's pay-roll figures for the purpose of determining the premium to be charged for the insurance. The information supplied by Jeske's bookkeeper was in the form of a memorandum showing costs for moving and wrecking. The defendant calculated the premium on the rate applicable to the "Building—Raising or Moving" classification of the extension schedule. It appears that said rate was approximately one fourth of that which would have

been applicable to a wrecking coverage without exclusion (h) in the policy.

Of record there was also evidence that on December 1, 1953, Klawun had issued a certificate of insurance in connection with Jeske's wrecking operation of a building for St. Mary's Congregation at Appleton; that on January 8, 1954, Klawun issued a similar certificate for the wrecking of a building by Jeske on behalf of St. John's Polish Catholic Congregation of Menasha; that on February 15, 1954, Klawun issued a similar certificate for the wrecking operation by Jeske of a building for St. Paul Evangelical Lutheran Congregation of Appleton. There is evidence to the effect that prior to the issuance of each of said certificates by Klawun, Jeske had advised him that the jobs involved wrecking. In the early part of January, 1954, Klawun had also issued a certificate in connection with a job bid on by Jeske involving the wrecking of a railway roundhouse at Madison. With reference to the roundhouse-job bid, the defendant advised Klawun by letter that it would not cover the same and stated that it would consider wrecking operations only if information regarding them were submitted "well in advance in time to secure proper approval." In its correspondence relating to this matter, the defendant indicated that its declination to cover the risk was prompted largely by concern of a greater exposure for liability than would ordinarily obtain, since employees of the railway company who might be injured would be subject to the Federal Employees Liability Act, 45 USCA, sec. 51 *et seq.*, instead of the Wisconsin Workmen's Compensation Act, sec. 102.01 *et seq.*, Wis. Stats. Jeske was requested to return the certificate issued by Klawun for the insurance on that job, and the certificate was returned. Neither the defendant's Chicago representatives nor Klawun ever informed Jeske before the accident on the Green Bay job that the defendant would not provide

coverage for that job, nor was demand made upon Jeske for the return of the certificate issued by Klawun for coverage of that job.

The plaintiff Jeske does not claim, nor is there evidence to establish any agreement between the parties on or before December 31, 1953 (the effective date of the renewal of the policy), for coverage different than that provided in the policy. The matter in controversy centers on whether the evidence establishes a subsequent agreement to modify the policy so as to provide property-damage coverage within the limits of the policy for the hazards involved in the wrecking of the building at Green Bay.

Reformation may be established by evidence of circumstances and the nature of the transaction and the conduct of the parties in relation thereto, provided the natural and reasonable inferences to be drawn therefrom clearly and decidedly prove the alleged mistake. *Kadow v. Aluminum Specialty Co., supra* (p. 79).

The evidence clearly and convincingly indicates that Jeske needed and desired property-damage insurance coverage for his wrecking operation on the Green Bay job; that he fully intended to enter into a contract with the defendant for such protection; that from Klawun's actions, he understood that the company was affording such protection to him, and that he believed such contract with the defendant was in existence when he undertook to dismantle the building at Green Bay. The evidence is equally clear and convincing that the defendant's agent, Klawun, was well acquainted with Jeske's general contracting operations, and that he, as well as the defendant's agent, Reynolds, and the defendant's Chicago representatives had full knowledge prior to the time that Jeske entered into the contract with the city of Green Bay, that the job was to be principally a wrecking operation. An agent's knowledge is knowledge of the company he represents. *Stilp v. New York Life Ins. Co.* (1918), 168 Wis. 264, 169

N. W. 606. The knowledge of Klawun, Reynolds, and the Chicago representatives was the knowledge of the defendant.

Various are the circumstances appearing in the evidence from which the court could reasonably infer that the defendant intended to be bound and did bind itself to afford to Jeske complete property-damage coverage within the policy limits in connection with the wrecking operations of the Green Bay job. Those circumstances reflected in the evidence which relate to the defendant's failure to decline to cover the risk and to give notice of such declination, coupled with its failure to seek a return of the certificate issued by Klawun in manner as it had done with reference to the Madison roundhouse job, appear to be conclusive of the issue. Jeske, after his previous experience in connection with the Madison roundhouse job, was obviously aware of the defendant's position that it would consider coverage for wrecking operations only in the event that the same were submitted in advance. It was within the proper province of the court to determine that in connection with the Green Bay job, Jeske presented his application for coverage of wrecking operations in advance, and that when Klawun, upon instructions from the defendant, advised Jeske that the defendant's top limits for the job would be those as shown in the policy, and when the defendant did not indicate a disinclination to go on the risk, and did not demand a return of the certificate issued by Klawun for property damage in the sum of $5,000, the defendant, by its conduct in such respects, definitely manifested its intention to be bound within the policy limits for all property damage in connection with that job.

It is considered that the court was also justified in drawing a reasonable inference from the circumstances as shown by the evidence, that Klawun, in his representative capacity, agreed orally to furnish the insurance for Jeske as required by the city of Green Bay's specifications. Those specifications did not exclude hazard of "collapse of a building." A

policy of insurance may be changed or modified by a new or a distinct agreement subsequently entered into between the parties or their authorized agents. 44 C. J. S., Insurance, p. 1120, sec. 281. See also 29 Am. Jur., Insurance, p. 233, sec. 238. An insurer is responsible for, and is liable in accordance with, modifications of insurance contracts made by agents acting in such respect within the scope of their actual or apparent authority. In the absence of statutory or contract provisions, or of restrictions upon the power known to the assured, a general agent has authority to modify, with the consent of the assured, contracts already in existence. 29 Am. Jur., Insurance, p. 234, sec. 239. Unless provided otherwise by statute, or by the contract of insurance itself, a modification may be made by an oral agreement. 44 C. J. S., Insurance, p. 1122, sec. 281. *Kiviniemi v. American Mut. Liability Ins. Co.* (1930), 201 Wis. 619, 231 N. W. 252. It does not appear from the evidence that Klawun, as a general agent, was restricted by the defendant from entering into an oral agreement for the modification of the policy so as to include complete property-damage coverage within the limits of the policy for Jeske's Green Bay job. Further, there is no evidence that Jeske was aware of such restrictions, if in fact they existed.

The defendant submits that notwithstanding that it may be held that the evidence is sufficient to justify a finding that modification of the policy was intended by the parties, nevertheless there is no evidence to indicate the terms of the modified policy. We are of the opinion that there is ample evidence to indicate the precise terms intended. As said in *Journal Co. v. General Acc. F. & L. Assur. Corp.* (1925), 188 Wis. 140, 148, 205 N. W. 800:

"In common practice the assured informs the agent of his coverage necessities and leaves it entirely to the agent to provide therefor. The average individual accepts the policy tendered relying upon the assurance on the part of the in-

surer, express or implied, that the policy affords him the coverage desired."

In the instant matter there is evidence of record justifying the court's finding that Jeske and Klawun intended bodily injury and property-damage coverage within the limits of the policy for the wrecking operation of the Green Bay building; that the term of such insurance was to be for the period of the policy; that the premium was to be paid on the basis of the pay roll for the wrecking job; that such provisions were to be embodied in the contract.

The defendant also urges that Jeske is not in a position to seek reformation of a contract that he has not read. In this regard the defendant relies strongly upon a statement in *Bostwick v. Mutual Life Ins. Co.* (1903), 116 Wis. 392, 403, 89 N. W. 538, 92 N. W. 246, that:

". . . representations made by an insurance agent at the time of the application for a policy of insurance is made constitute no excuse for failure of the applicant to look at his policy when it is delivered to him, to see if it corresponds to the one expected, and to discover the facts in that regard if that can be done by a reasonable examination of the paper; that if one fails to read his contract under such circumstances, having full opportunity for doing so and ability to read, he is guilty of gross negligence and cannot be heard successfully to say that he kept it in ignorance of its character; that the rule in that regard applies to all contracts, insurance contracts being no exception."

The *Bostwick Case* involved an action for rescission, and not one for reformation. As said in *Barly v. Public Fire Ins. Co.* (1931), 203 Wis. 338, 344, 234 N. W. 361:

"For various reasons stated in the Wisconsin cases cited above, the doctrine of the *Bostwick Case* was not considered applicable in those actions for reformation and recovery on contracts of insurance which the insured did not rescind."

In *Collum v. National Fire Ins. Co.* (1923), 181 Wis. 425, 427, 428, 195 N. W. 333, this court said:

"It is claimed by the defendant that the insured was required to know the terms of his policy and that his retention thereof with such warranty therein binds him thereto.

"There is a spirited conflict among the authorities as to whether an insured may recover under such circumstances. The question is exhaustively considered by the Minnesota supreme court in *Parsons, Rich & Co. v. Lane,* 97 Minn. 98, 106 N. W. 485, 4 L. R. A., N. s., 231, where it is held that the plaintiff may not recover. It is also quite as thoroughly considered by the Indiana supreme court in *Glens Falls Ins. Co. v. Michael,* 167 Ind. 659, 74 N. E. 964, 8 L. R. A., N. s., 708, where it is held that the plaintiff may recover. A perusal of these two cases will supply the investigator with the reasons and authorities upon which the conflicting conclusions rest. The question would be an interesting albeit perhaps a troublesome one were we permitted or required to consider it as an original proposition in this court. . . .

"It seems to be firmly intrenched in the jurisprudence of this state and aligns this court with those holding that an insured may recover on an insurance policy under circumstances here presented. We perceive neither justification nor excuse for re-examination of the question, and must hold that the plaintiff is entitled to recover in view of the fact that the finding of the trial court exonerated plaintiff from any fraudulent or intentional concealment of the conditional nature of his title to the truck.

"It is urged that the rule of *Bostwick v. Mutual L. Ins. Co.* 116 Wis. 392, 89 N. W. 538, 92 N. W. 246, where knowledge of the contents of a life insurance policy was imputed to the insured when he attempted to repudiate the same several months after its receipt, should be here invoked to defeat plaintiff's recovery. It must be remembered that in that case the plaintiff was attempting to repudiate the policy and not to collect thereon."

In *Journal Co. v. General Acc. F. & L. Assur. Corp. supra* (pp. 148, 149), this court said:

"In many instances a reading of the policy would not be enlightening to the assured. It is couched in technical terms and often complicated and involved. This is especially true of the ordinary accident or liability policy, where a provision apparently affording general and sweeping indemnity is conditioned and limited by general subsequent provisions, many of which have slight bearing upon the specific liability assumed."

See also *Komula v. General Acc. F. & L. Assur. Corp.* (1917), 165 Wis. 520, 162 N. W. 919, and *Emmco Ins. Co. v. Palatine Ins. Co.* (1953), 263 Wis. 558, 58 N. W. (2d) 525.

We are thus constrained to hold that Jeske's failure to have read or to have known the terms of his policy cannot defeat his action for reformation of the policy. It appears too, that had Jeske read the exclusions in the extension schedule which related to operations away from his plant premises, he would have been entitled to consider that exclusion (h) of the policy did not apply thereto, for it was not incorporated therein. It is considered that the evidence is sufficient to support the findings that Jeske was not cognizant of the exclusions in the policy, and that he had not been informed by the defendant's agents or other representatives that his policy did not cover damage arising from the collapse of a building. In *Pouwels v. Cheese Makers Mut. Casualty Co.* (1949), 255 Wis. 101, 106, 37 N. W. (2d) 869, this court said:

"It is well established that when clear and satisfactory evidence demonstrates that through inadvertence, accident, or mistake the terms of a contract of insurance are not fully or correctly set forth in the policy, it may be reformed in equity so as to express the actual contract intended by the parties. See 29 Am. Jur., Insurance, p. 237, sec. 241; *Wisconsin Auto Racing Asso. v. Home Ins. Co.* (1934), 216 Wis. 321, 257 N. W. 7; *Fountain v. Importers & Exporters Ins. Co.* (1934), 214 Wis. 556, 252 N. W. 569;

*Schmidt v. Prudential Ins. Co.* (1940), 235 Wis. 503, 292 N. W. 447."

There is ample evidence of record to support the trial court's finding of inadvertence and mutual mistake on the part of the parties with respect to their insurance contract, and that while the policy did not provide for property-damage coverage in accordance with the plaintiff's contract with the city of Green Bay, it was clearly the intent of the parties that it was to so provide. The judgment of reformation must be upheld.

With reference to the defendant's second contention, viz., that it is entitled to reformation of the contract so as to include exclusion (h), it submits, that since the policy was issued in renewal of previous coverage, and that since there is no evidence of an agreement for a change in the coverage, it is entitled as a matter of law to reformation of the policy to include exclusions omitted by a clerical mistake not relied on by the plaintiff.

The trial court determined that Jeske had no actual knowledge of any exclusions contained in the policy which would prevent coverage in the event of property damage to others resulting from his razing or dismantling operations, and that although the defendant's agent, Klawun, understood that the Green Bay job involved razing and dismantling, he never informed Jeske of any exclusions applicable to such coverage. The evidence supports such findings. Reformation of an insurance policy is proper when a mutual mistake has been made. *Schmidt v. Prudential Ins. Co.* (1940), 235 Wis. 503, 292 N. W. 447. Here the mistake, if any, in not including exclusion (h), was unilateral on the part of the defendant. In *Fountain v. Importers & Exporters Ins. Co.* (1934), 214 Wis. 556, 252 N. W. 569, an insurance company issued a policy covering certain automobiles which its agent knew to be incumbered. The policy provided that coverage was

not afforded to property while subject to incumbrance. This court said (p. 560):

: "It quite clearly appears, however, that the intention in the instant case was to cover the specific cars described in the policy. The court expressly found that the agent of the defendant had knowledge that 'Fleming financed the purchase and handling of the cars and held the title papers.' This was equivalent to finding that the agent had knowledge that the cars were in fact mortgaged. To permit the defendant to avoid liability under such circumstances would permit it to perpetrate a constructive fraud. The plaintiff intended to procure insurance. The agent intended to issue insurance. Both understood insurance was effected. There was a mutual mistake of the parties as to the effect of the policy."

The defendant relies on the decision in *Schafer v. Shelby Farmers Mut. Ins. Co.* (1945), 246 Wis. 592, 18 N. W. (2d) 365, 19 N. W. (2d) 241, where reformation was granted on the basis that the new policy was intended to be a renewal of the previous year's coverage. However, in that case it was found that both the assured and the agent knew the terms of the original policy and had knowledge of the items covered, and that the agent had specifically informed the assured that the new policy was the same as the old.

The defendant also relies on the result in *Schmidt v. Prudential Ins. Co., supra.* There, the insured made claim under a policy in which the disability payment was stated to be $50 a month. Reformation was permitted principally on the basis that the premium paid was for a policy in which the disability payments were to be $25 a month. However, the court found that the parties had contemplated a contract not substantially out of harmony with the rates and terms that prevailed among like or similar insurance companies.

In the case at bar the evidence reveals that a contract such as was found by the court to have existed, without the application of exclusion (h), would have carried a premium in amount approximately four times that which was provided

in the extension schedule. In the *Schmidt Case* the premium was determined at the outset, and the assured had paid a premium which would have entitled him to a disability benefit of $25 a month. In the instant matter the premium was to be determined at a later time, and was to be based on figures which included the Green Bay wrecking-job pay roll. Obviously if the rate charged by the defendant upon the wrecking-job pay roll was improper, it was the fault of the defendant's auditor.

We find no error with respect to the court's declination to reform the insurance contract in so far as it applied to the Green Bay wrecking job, so as to include exclusion (h) therein.

With reference to the defendant's contention that the plaintiff may not recover on any theory of estoppel, it is urged that (a) the record is devoid of evidence of representation of any kind to the plaintiff that he had coverage other than that specifically defined by the terms of his policy; (b) the terms of an insurance contract cannot be enlarged or broadened by estoppel; and (c) there being no evidence of any agreement for a coverage different than that written in the policy, issued to and accepted by the plaintiff, there is no basis for finding an oral contract of insurance.

Since, as above indicated, the trial court was justified in determining that modification of the policy was orally agreed upon by the parties so as to afford coverage for wrecking in accordance with the city of Green Bay's specifications, we need not further discuss the claims of the defendant that the evidence fails to disclose representation to the plaintiff that his wrecking operation at Green Bay was covered, and that there was no agreement different than that included in the policy.

In its position that the terms of the policy could not be enlarged or broadened by estoppel, the defendant relies on *Two Rivers D. & D. Co. v. Maryland Casualty Co.* (1918),

168 Wis. 96, 169 N. W. 291, where it was held that estoppel cannot be successfully invoked to create a liability for benefits not contracted for at all. Here, benefits were contracted for through the modification of the contract which resulted from the verbal agreement of the parties. On the basis of the modified contract, the defendant's agent issued a certificate in which, as found, he intended on behalf of the defendant to cover the risk in manner as prescribed by the city of Green Bay and as desired by Jeske.

The *Two Rivers Case* recognized and approved the rule in *Welch v. Fire Asso.* (1904), 120 Wis. 456, 98 N. W. 227, that estoppel may be applied to hold stipulations in insurance policies ineffective upon the ground that the action and conduct of the parties showed an intent that indemnity was intended to be given. The rule of the *Welch Case* was reaffirmed in *Spohn v. National Fire Ins. Co.* (1926), 190 Wis. 446, 452, 209 N. W. 725:

"In the *Welch Case* the doctrine of waiver was not involved, and the case was decided solely on the principle of estoppel *in pais,*—'the principle that one person cannot assume a position in his business relations with another in respect to a transaction of a pecuniary nature upon which such other, acting reasonably, has a right to rely, and after such other has so acted change his position to that other's prejudice and obtain judicial aid to enable him to effectuate his fraudulent purpose.' The *Welch Case* has been repeatedly cited and approved in subsequent decisions of this court, and the law as there laid down is in full force and effect at the present time, and is applicable to contracts of insurance issued under the present standard policy law."

In the *Spohn Case* the policy provided for a forfeiture in the event of a change of ownership interest in the property without the consent of the insurer. The ownership of the property was transferred from the insured to another who applied to the insurer's agent for transfer of coverage. Without complying with the insurer's procedure for transfer, the

agent returned the policy to the transferee and told him that everything had been done. A loss ensued, and the insurer denied liability. The court held that estoppel was applicable. It was there said (pp. 456, 458) :

"Having granted to the agent the authority to consent to a change in ownership and to validate such change, the acts of the agent become the acts of the company, and it is bound by such acts. So that it can be said that when Johnson represented and pretended that all of the necessary requisites had been complied with and that the plaintiff was fully protected, the plaintiff having relied upon such representations and statements and having changed his position in regard to the same to his detriment, the company will not now be heard to complain or to profit by the failure of its agent. . . .
"The case therefore presents a situation where the plaintiff did everything that an ordinarily prudent man would do under the same or similar circumstances, and was led to believe by the agent who had authority to represent the company that he was fully protected, which, of course, was untrue, and under the decision in the *Macomber Case* it is strongly intimated that had the facts in the case been otherwise an estoppel *in pais* could have resulted."

On the basis of the certificate issued by the defendant's agent, the plaintiff as well as the city of Green Bay was justified in believing that the wrecking operation *in toto* was covered by the policy within the limits thereof.

"Equitable estoppel or estoppel *in pais* is the principle by which a party who knows or should know the truth is absolutely precluded, both at law and in equity, from denying, or asserting the contrary of, any material fact which, by his words or conduct, affirmative or negative, intentionally or through culpable negligence, he has induced another, who was excusably ignorant of the true facts and who had a right to rely upon such words or conduct, to believe and act upon them thereby, as a consequence reasonably to be anticipated, changing his position in such a way that he would suffer injury if such denial or contrary assertion were allowed." 19 Am. Jur., Estoppel, p. 634, sec. 34.

As above noted, the doctrine of estoppel applies to insurance contracts. *Welch v. Fire Asso., supra,* and *Spohn v. National Fire Ins. Co., supra.*

In the light of the circumstances as found by the trial court, the defendant may not be permitted to change its position and deny coverage, after the plaintiff, with knowledge of the defendant, in good faith relied on the contract as certified by the defendant's general agent, and is estopped from so doing.

In view of the conclusions as heretofore expressed, we consider that it is unnecessary to decide the contentions of the respective parties with reference to waiver of right by the defendant to claim that the liability policy did not afford coverage for the wrecking of the Green Bay building.

*By the Court.*—Judgment affirmed.