SAMUELS RECYCLING COMPANY, Plaintiff-Appellant,

v.

CNA INSURANCE COMPANIES, Continental Casualty Company, Continental Insurance Company, Transcontinental Insurance Co., Transportation Insurance Co., Defendants-Respondents.

Court of Appeals

*No. 97–3511. Submitted on briefs September 4, 1998.—Decided November 25, 1998.*

(Also reported in 588 N.W.2d 385.)

234

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Richard W. Pitzner* and *Edward S. Marion* of *Murphy & Desmond, S.C.* of Madison.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Stephen Sonderby* of *Haskell & Perrin* of Chicago, and *Richard G. Niess* of *Coyne, Niess, Schultz, Becker & Bauer, S.C.* of Madison.

Before Vergeront, Roggensack and Deininger, JJ.

VERGERONT, J. Samuels Recycling Company appeals two trial court orders granting the motion of CNA Insurance Companies[1] for summary judgment

---

[1] The insurance companies named as defendants—Continental Casualty Company, Continental Insurance Company, Transcontinental Insurance Company, and Transportation Insurance Company—have common ownership, are members of a marketing group known as the CNA Insurance

and dismissing Samuels' claims.[2] Samuels asserted these claims: its CNA insurance policies should be reformed to cover the government-ordered environmental cleanup and remediation costs; CNA acted in bad faith in delaying payment on Samuels' claims; and CNA failed to provide loss control services, or negligently provided them. We agree with the trial court's determination that there are no genuine issues of material fact on any claim and that CNA is entitled to judgment on each as a matter of law. We therefore affirm.

## BACKGROUND

Samuels is a scrap processing and recycling company that incurred a number of liabilities for environmental cleanup and remediation. Prior to incurring the liabilities, Samuels purchased standard-form comprehensive general liability (CGL) insurance policies from CNA.[3] The standard-form CGL insurance policies provided:

> The [insurance] company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay *as damages* because of
> (a) bodily injury, or
> (b) property damage

Group, and issued policies to Samuels. We will refer to them collectively as CNA.

[2] All claims were dismissed by summary judgment except one, which the court dismissed without prejudice on stipulation of the parties. That claim, breach of contract with regard to nonpayment of a claim for the defense and settlement of a lawsuit, is not an issue in this appeal.

[3] The policies at issue on appeal were purchased prior to 1982.

to which this insurance applies, caused by an occurrence and the [insurance] company shall have the right and duty to defend any *suit* against the insured *seeking damages.* . . .[4]

(Emphasis added.)

On September 27, 1991, Samuels submitted a claim to CNA. This claim, together with two supplemental claims submitted in August 1992, requested payment for the following expenses: several cleanup and remediation measures required by the Wisconsin Department of Natural Resources (DNR) aimed at addressing alleged groundwater contamination problems pursuant to a consent order from the DNR; the defense and eventual settlement of a private lawsuit in which Samuels was named as a party, *Gould v. Alter Metals Co.*; and responding as a potentially responsible party to the United States Environmental Protection Agency (EPA) as a shipper of lead acid battery materials to a secondary lead smelting facility. CNA did not pay the claims, but instead asserted several policy defenses.

One of CNA's policy defenses was that the cost of the cleanup required by the DNR and EPA were not the result of a lawsuit and therefore were not covered as "damages" under the CGL policies. At the time Samuels submitted the claims to CNA, Wisconsin appellate courts had not yet interpreted this policy language. However, on November 25, 1992, we decided *City of Edgerton v. Gen. Cas. Co.* (*Edgerton I*), 172 Wis. 2d 518, 493 N.W.2d 768 (1992), *rev'd,* 184 Wis. 2d 750, 517 N.W.2d 463 (1994) (*Edgerton II*), in which we held that government-ordered cleanup costs are considered

---

[4] Although some of the policies are worded slightly differently, all contain the same two relevant terms, "suit" and "damages," as prerequisites to coverage.

"damages" covered under the standard-form CGL policy when the government assumes an adversarial posture, regardless of whether a formal lawsuit has been filed. Samuels continued to seek payment of its claims and CNA continued to reserve its rights to deny coverage based on this and other defenses.

Samuels filed a complaint against CNA[5] on April 15, 1993, asserting various claims arising out of the nonpayment of Samuels' environmental liability claims, including a claim for breach of contract for not paying the government-ordered cleanup costs as required by *Edgerton I*. In June 1994, the supreme court reversed *Edgerton I* and held that "damages" covered by the standard-form CGL policy must result from a suit in a court of law. *City of Edgerton v. Gen. Cas. Co.* (*Edgerton II*), 184 Wis. 2d 750, 782–83, 517 N.W.2d 463, 477–78 (1994). Based on *Edgerton II*, the trial court dismissed Samuels' breach of contract claim for government-ordered cleanup costs and allowed Samuels to file an amended complaint.

Samuels amended its complaint in October 1995, asserting four claims. The first claim was breach of contract by CNA for failing to defend Samuels in the *Gould* case, and for failing to indemnify Samuels in connection with the consent orders entered in that litigation. Subsequently, the supreme court ruled that *Edgerton II* did not relieve insurers from defending insureds named as third parties in lawsuits seeking recovery for environmental response costs. *Gen. Cas. Co. v. Hills* (*Hills II*), 209 Wis. 2d 167, 170, 561 N.W.2d 718, 720 (1997), *affirming Gen. Cas. Co. v. Hills* (*Hills I*), 201 Wis. 2d 1, 548 N.W.2d 100 (Ct. App. 1996). The

---

[5] Samuels also named other insurance companies in its complaint, but has settled those claims.

parties therefore stipulated to dismissal without prejudice of the *Gould* breach of contract claim.

The remaining claims in the amended complaint were: reformation of the standard form CGL policy to express the alleged intentions of the parties to include coverage for government-ordered cleanup and remediation costs; bad faith by CNA because it asserted policy defenses it knew or should have known were unavailable as a matter of law; and negligence arising out of CNA's alleged negligent inspections and loss control services. CNA moved for summary judgment on these claims, and the trial court granted the motion. The court concluded there were no genuine issues of material fact and CNA was entitled to a judgment of dismissal as a matter of law.

## DISCUSSION

A party is entitled to summary judgment if the properly submitted evidence shows that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *See* § 802.08(2), STATS.; *see also Germanotta v. Nat'l Indem. Co.,* 119 Wis. 2d 293, 296, 349 N.W.2d 733, 735 (Ct. App. 1984). When reviewing a grant of summary judgment, we apply the same methodology as the trial court. *Continental Cas. Co. v. Wis. Patients Compensation Fund,* 164 Wis. 2d 110, 115, 473 N.W.2d 584, 586 (Ct. App. 1991). We examine the submissions of CNA on each claim to determine whether it has presented a *prima facie* defense to that claim. *See Brownelli v. McCaughtry,* 182 Wis. 2d 367, 372, 514 N.W.2d 48, 49 (Ct. App. 1994). If we determine it has done so, we examine the submissions of Samuels to determine whether they create a genuine issue of material fact.

*See E.S. v. Seitz*, 141 Wis. 2d 180, 186, 413 N.W.2d 670, 673 (Ct. App. 1987). Although our review is de novo, we benefit from the trial court's careful analysis.

*Reformation*

Samuels argues that, despite the ruling in *Edgerton II* that standard-form CGL insurance policies do not cover government-ordered environmental cleanup costs, its CGL policies should be reformed to cover these costs because both Samuels and CNA intended they be covered. The trial court concluded that CNA's submissions showed that Samuels did not consider cleanup and remediation costs at the time it purchased the insurance policies at issue, thereby presenting a *prima facie* defense to the reformation claim. The court further concluded that Samuels presented no evidence that it and CNA agreed the costs would be covered and that such an agreement was not included in the policy because of a mistake of the parties. Therefore, the court decided, Samuels failed to show an issue of material fact. We agree with this analysis.

Reformation of an insurance policy is allowed when the one seeking reformation shows that, because of a mutual mistake, the policy does not contain provisions desired and intended to be included.[6] *Sprangers v. Greatway Ins. Co.*, 175 Wis. 2d 60, 70, 498 N.W.2d 858, 863 (Ct. App. 1993). Mutual mistake is established when the party applying for insurance proves he or she made certain statements to the agent concerning the coverage desired, but the policy as issued does not pro-

---

[6] Samuels does not argue for reformation based on fraud, another basis for reformation. *See Sprangers v. Greatway Ins. Co.*, 175 Wis. 2d 60, 70, 498 N.W.2d 858, 863 (Ct. App. 1993).

243

vide the coverage desired. *Id.* at 71, 498 N.W.2d at 863. There must be clear and convincing evidence of an oral agreement or understanding that the parties intended the written policy to express, which, due to mutual mistake, the written policy did not express. *See Ahnapee & W. Ry. Co. v. Challoner*, 34 Wis. 2d 134, 137, 148 N.W.2d 646, 648 (1967); *see also Kadow v. Aluminum Specialty Co.*, 253 Wis. 76, 78, 33 N.W.2d 236, 237 (1948) ("[t]o justify reformation the evidence must be clear and convincing . . . that both [parties] had agreed upon facts which were different than those set forth in the instrument").

CNA contends its materials show that Samuels did not make any statements at the time the policies were purchased indicating that it desired coverage of government-ordered cleanup and remediation costs. CNA submitted the deposition of Clifford Olson, the individual in charge of purchasing insurance for Samuels. Olson stated "I don't think we even considered it at that time." Olson also stated he did not rely on cleanup costs and remediation costs being covered in ordering the insurance, but he "just figured if you had liability, you had coverage for those type of things." We agree with the trial court that this evidence is sufficient to establish a *prima facie* defense to the reformation claim.

We now consider whether Samuels established an issue of material fact requiring a trial. Samuels cites *Ahnapee & W. Ry. Co.*, 34 Wis. 2d at 140, 148 N.W.2d at 649, for the proposition that "circumstances, the nature of the transaction and the conduct of the parties may be considered" in determining the true meaning which the parties intended. Samuels argues that its submissions show: Samuels' employees who purchased insurance believed the disputed cleanup costs were covered; the agents who sold Samuels the policies

understood the costs to be covered; CNA routinely paid claims without suits for damages; and CNA represented to third parties that CGL policies covered cleanup costs.[7] Although Samuels contends that this

[7] Specifically, Samuels submitted the following evidence. Olson, who purchased the CGL policies in question for Samuels averred he "understood" that the policies included "all risks" and he believed the cleanup costs were covered regardless of a formal lawsuit. Robert Est, who purchased CGL policies in 1974–1976 for Betten Processing (whose policies later merged with Samuels' policies), averred he believed cleanup costs were covered. Robert Dalrymple, an independent insurance agent who sold Samuels the CNA policies, averred he believed that Samuels and CNA had a mutual understanding that the policies did not require a suit or damage award. He believed this because he knew that CNA had paid numerous claims without a lawsuit or a damage award and that such cleanup and remediation costs were never expressly excluded. James Kneeland, another insurance agent, also averred that CNA routinely paid claims without the necessity of a lawsuit or formal damage award. In a brief for a different lawsuit concerning different issues and directed to a federal district court in Washington state, CNA stated that CGL policies covered cleanup costs. In a September 3, 1982 correspondence from CNA to the Scrap Institute, CNA stated that the CGL policies provided coverage for cleanup costs. In a June 4, 1982 letter from Alan Holst, a supervisor in CNA's underwriting department, to agent Dalrymple, Holst indicated that CGL policies cover pollution losses. CNA's "Pollution and Hazardous Waste Claims" Guide states that cleanup costs may be covered.

The trial court ruled that the affidavits of Est and Kneeland were irrelevant because the two were not involved in Samuels' insurance at the time it purchased the policies at issue; and that the briefs written by CNA attorneys in another lawsuit were not admissible as evidentiary admissions of CNA and were not properly authenticated. CNA argues, in addition, that evidence regarding whether "cleanup costs" in general were covered is

evidence shows both parties "understood" and "believed" government-ordered cleanup costs were covered by the CGL policies, Samuels provides no evidence of any conversations or communications between Samuels and CNA indicating this was their understanding or agreement when the policies were issued to Samuels. Such evidence is necessary in order to prevail on a claim for reformation. *See Ahnapee & W. Ry. Co.*, 34 Wis. 2d at 137, 140, 148 N.W.2d at 648, 649; *Kadow*, 253 Wis. at 78, 33 N.W.2d at 237.

Samuels asserts that it need not show that the parties specifically discussed coverage for government-ordered cleanup costs. However, Samuels offers no support in Wisconsin case law for this proposition, and we are aware of none. To the contrary, the cases cited by Samuels clearly indicate that a discussion between the parties of coverage different than that expressed in the written policy *is* necessary for a reformation claim to prevail. *See, e.g., Jeske v. Gen. Accident Fire & Life Assurance Corp.*, 1 Wis. 2d 70, 78, 83 N.W.2d 167, 172 (1957) ("to justify reformation the evidence . . . must clearly show that both [parties] had agreed upon facts which were different than those set forth in the instrument").

■

In the context of interpreting the policy in *Edgerton II*, 194 Wis. 2d at 780, 535 N.W.2d at 103, the supreme court considered the intentions of insurers and insureds, in general, regarding whether govern-

irrelevant because the issue is whether the cleanup costs are government-ordered or included within damages in a suit in a court of law. We do not decide whether the trial court properly excluded or admitted these submissions because, even when we consider all of them, they do not create an issue of material fact for the reasons we explain in our decision.

ment-ordered environmental cleanup costs are covered under standard-form CGL policies. As we recently reiterated, "The court in *Edgerton* unequivocally construed the term 'damages' as not including environmental response and remediation costs under either state or federal action." *Amcast Indus. Corp. v. Affiliated FM Ins. Co.*, 221 Wis. 2d 145, 165, 584 N.W.2d 218, 226 (Ct. App. 1998).[8] Reformation is not a vehicle for parties to re-litigate settled issues of contract construction. Absent some evidence of an oral agreement that its particular CGL policies were intended to provide broader coverage than the standard-form CGL policy, Samuels' argument is precluded by *Edgerton II*. We therefore conclude the trial court properly granted CNA summary judgment on the reformation claim.[9]

*Bad Faith*

Samuels contends that CNA committed the tort of bad faith by denying Samuels' claims under the CGL policies with defenses that were allegedly unavailable as a matter of law and by failing to conduct a thorough

---

[8] *Amcast Indus. Corp. v. Affiliated FM Ins. Co.*, 221 Wis. 2d 145, 584 N.W.2d 218 (Ct. App. 1998), is a case with facts similar to this one, although the claim is for breach of contract, rather than reformation. In *Amcast*, the plaintiff also presented evidence on the insurers' intent regarding the CGL policies at issue. We concluded that such evidence does not create a genuine issue of material fact because after *Edgerton II* there is "no ambiguity in the contract language." *Id.* at 165, 584 N.W.2d at 226.

[9] In addition to the lack of an oral agreement, CNA also argues that the evidence offered by Samuels is insufficient because it relates only to "cleanup" costs generally, not to cleanup costs that are not part of lawsuit damages. Our decision makes it unnecessary to consider this alternative argument.

investigation. The trial court granted CNA's motion for summary judgment on this issue because it concluded the policy defenses and exclusions relied on by CNA were "being actively litigated in Wisconsin and elsewhere and were 'fairly debatable' at the time they were claimed by the CNA defendants."

In order to establish a claim for the tort of bad faith the insured must prove the absence of a reasonable basis for denying benefits of the policy and the insurer's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. *Anderson v. Continental Ins. Co.*, 85 Wis. 2d 675, 691, 271 N.W.2d 368, 376 (1978). The first component of this two-part test is based on an objective standard: would a reasonable insurer under the circumstances have denied or delayed payment of the claim under the facts and circumstances. *Id.* at 692, 271 N.W.2d at 377. When either the law or facts supporting a claim are "fairly debatable," a reasonable insurer is entitled to debate the claim, and doing so is not considered bad faith. *Id.* at 691, 271 N.W.2d at 376.

Samuels filed its original claim with CNA in 1991. Samuels contends that, despite the fact that CNA was eventually exonerated from liability for Samuels' claims for government-ordered cleanup costs by *Edgerton II*, under the law between December 1992 (*Edgerton I*) and June 1994 (*Edgerton II*), CNA was required to pay Samuels' claims and committed the tort of bad faith in not doing so. CNA responds that the law regarding whether government-ordered cleanup costs were covered by standard-form CGL insurance policies was unsettled at the time of Samuels' claims, and the legal basis for the claims was therefore "fairly

debatable." The facts relevant to resolution of this issue are not disputed. We agree with the trial court that CNA's defense that government-ordered cleanup costs were not covered was based on a fairly debatable point of law.

At the time we decided *Edgerton I*, the law of CGL policies and government-ordered cleanup costs was in the development stage in Wisconsin and around the country. *See Edgerton II*, 184 Wis. 2d at 786–87, 517 N.W.2d at 479 (Abrahamson, J., dissenting). Although our decisions are binding precedent until they are reversed by the supreme court, and although we have some role in the development of the law, the primary role of implementing statewide development of the law belongs to the supreme court. *See Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246, 255–56 (1997); *State v. Schumacher*, 144 Wis. 2d 388, 404–05, 424 N.W.2d 672, 678 (1988). A petition for review of *Edgerton I* was filed; the supreme court granted the petition and eventually reversed *Edgerton I*. Under these circumstances, it was reasonable for CNA to consider the issue we decided in *Edgerton I* to be "fairly debatable" until our supreme court ruled on it.

█

Samuels also contends CNA committed the tort of bad faith by failing to pay Samuels' claim for losses resulting from the defense and eventual settlement of the *Gould* lawsuit. Although the breach of contract claim for the *Gould* liability was dismissed without prejudice by stipulation of the parties, the issue whether CNA acted in bad faith with respect to that litigation remains in this lawsuit. The law concerning whether private lawsuits for environmental cleanup costs triggered coverage under CGL policies was also in the development stage in Wisconsin until 1995. *See*

*Hills I*, 201 Wis. 2d 1, 548 N.W.2d 100; *see also Hills II*, 209 Wis. 2d 167, 561 N.W.2d 718. Even in cases where coverage under the policy is ultimately established, as Samuels contends is the case here, it does not necessarily follow that the insurer denied the policy claim in bad faith. *See Mills v. Regent Ins. Co.*, 152 Wis. 2d 566, 574, 449 N.W.2d 294, 297 (Ct. App. 1989) ("The fact that coverage under the policy was ultimately established fails to prove the insurer denied the policy claim in bad faith."). It is the state of the law at the time the claim is denied that is dispositive. We conclude the state of the law applicable to the *Gould* claim was fairly debatable from the time the claim was made until *Hills II* was decided by the supreme court. It was therefore reasonable for CNA to delay defending and indemnifying Samuels in that lawsuit.

Samuels contends there is evidence supporting its bad faith claim on other grounds: CNA knowingly claimed other allegedly erroneous policy defenses such as "late notice," "sudden and accidental," "owned property," and "lacked information"; and CNA's investigation was deficient. However, when an objectively reasonable basis to deny coverage exists, as it does here, it is not necessary to consider evidence of investigation flaws or the subjective element of bad faith. *Mills*, 152 Wis. 2d at 576, 449 N.W.2d at 298. We therefore affirm the summary judgment in favor of CNA on the bad faith claim.

*Loss Control*

Samuels contends that CNA failed to provide, or negligently provided, loss control services. Samuels offered evidence of the following in support of this claim: CNA did not train its loss control representa-

tives to inspect for pollution; CNA instructed Samuels to water its battery breaking area and operations without warning them that the contaminated water should be collected and treated; and, after discussion with Samuels about an oil leak, CNA failed to make a recommendation or express any disagreement with Samuels' inadequate remedy of digging a trench to catch future leakage. According to Samuels, under various sponsorship and dividend agreements between CNA and the Institute of Scrap Iron and Steel, Inc. (ISIS),[10] a trade organization of which Samuels was a member, CNA was obligated to provide information about risks, conduct inspections, make safety recommendations, and provide an active safety, accident and loss prevention program. Samuels asserts that it is entitled to enforce these agreements as a third-party beneficiary.

Section 895.44, STATS., exempts insurers from civil liability for safety and loss prevention services, with certain exceptions:

> **Exemption from civil liability for furnishing safety inspection or advisory services.** The furnishing of, or failure to furnish, safety inspection or advisory services intended to reduce the likelihood of . . . loss shall not subject . . . an insurer, the insurer's agent or employe undertaking to perform such services as an incident to insurance, to liability for damages from . . . loss occurring as a result of any act or omission in the course of the safety inspection or advisory services. This section shall not apply if the active negligence of . . . the insurer, the insurer's agent or employe created the condition that was the proximate cause of . . . loss. This section shall not apply to an insurer, the insurer's

---

[10] The group later became known as the Institute of Scrap Recycling Industries (ISRI).

agent or employe performing the safety inspection
or advisory services when required to do so under
the provisions of a written service contract.

Section 895.44. Samuels argues the exemption does not
apply to CNA because: (1) the services were provided
under a "written service contract"; (2) CNA's loss con-
trol services were not "incident to insurance"; and (3)
CNA is guilty of "active negligence." The trial court
rejected these contentions, concluding that CNA was
exempt under this statute from civil liability regarding
its loss control services. Again, we agree with the trial
court's analysis.

The sponsorship and dividend agreements that
Samuels refers to are between ISIS and CNA. Under
these agreements, ISIS is to assist CNA by communi-
cating the availability of CNA's "insurance program" to
ISIS members. This program includes CNA insurance
policies and opportunities for ISIS members to earn
dividends from CNA by following loss control recom-
mendations and keeping the industry's losses low.

Under these agreements ISIS obligated itself to
establish a committee to advise CNA on the scrap
industry; establish a safety committee to assist CNA in
developing safety standards and programs; provide
information to facilitate CNA's collection of premiums
from ISIS members; and actively promote the CNA
insurance and safety programs through seminars and
ISIS publications. In consideration, CNA agreed to
reimburse ISIS for some expenses; insure ISIS against
any legal action arising out of the agreements; and
distribute "safety group dividends" to participating
insureds from CNA's earned surplus, with the declara-
tion of dividends to be at the sole discretion of the board
of directors of CNA. The bulk of the written agreements
describe the details of the dividend plan.

Whether the agreements are "written service contracts" within the meaning of § 895.44, STATS., requires that we construe the statute. This presents a question of law, which we review de novo. *See Lincoln Sav. Bank, S.A. v. DOR*, 215 Wis. 2d 430, 441, 573 N.W.2d 522, 526 (1998). Our aim in statutory construction is to discover the legislature's intent, and we begin with the plain language of the statute. *Id.*

There is no statutory definition of "written service contract" and the scant case law on § 895.44, STATS., does not address this issue. *Am. Mut. Liab. Ins. Co. v. St. Paul Fire and Marine Ins. Co.*, 48 Wis. 2d 305, 319 n.2, 179 N.W.2d 864, 871 (1970), does suggest, however, that the purpose of § 895.44 is to eliminate a cause of action for negligence against an insurer that has negligently performed a gratuitously undertaken inspection. *See also A.O. Smith Corp. v. Viking Corp.*, 79 F.R.D. 91, 93 (E.D. Wis. 1978). We conclude that a "written service contract" is a contract that obligates the insurer to provide loss control services to an insured. We further conclude that the sponsorship and dividend agreements are not such contracts. They do not obligate CNA to provide loss control services to participating insureds but, rather, obligate CNA to pay some of ISIS's expenses and to distribute dividends if declared by CNA's board. It is implicit in the agreements that CNA is engaged in providing safety inspection services to its insureds, because the agreements obligate ISIS to assist CNA in those efforts. And the agreements promote the cooperation of insureds in CNA's safety programs by offering the incentive of sharing in the savings from those efforts. However, these agreements cannot reasonably be construed to

253

require CNA to provide those safety programs and services.

We also reject Samuels' argument that the safety programs referred to in the agreements, and any loss control services CNA actually provided Samuels, were not "incident to insurance." Only ISIS members who purchased CNA policies could participate in the safety group dividend program. There is evidence that CNA actually performed some safety inspection services for Samuels; but there is no evidence that Samuels was charged for those services separate from the premiums Samuels paid CNA. The only reasonable inference from this evidence is that CNA provided Samuels those services "incident to [the] insurance" it provided Samuels.

Finally, we conclude that the "active negligence" exception does not apply. Samuels contends that CNA's "active negligence" led to Samuels watering its battery breaking area and digging a trench to catch an oil leak. However, there is no evidence that the alleged negligence "created the condition that was the proximate cause" of the loss, as required by § 895.44, STATS. Samuels points to the affidavit of engineer Bruce Iverson averring that there was oil contamination in the soil and that the lead contamination of Samuels' facilities was "consistent with" the "wet metal shredder operations and battery processing operations." However, this does not show a causal connection. *See Merco Distrib. Corp. v. Commercial Police Alarm Co.*, 84 Wis. 2d 455, 460, 267 N.W.2d 652, 655 (1978) (causation cannot be based on speculation and conjecture).

In summary, we conclude that Samuels is not entitled to a trial on the reformation claim because there is no evidence of an oral agreement different from the

254

agreement expressed in the written policy. We also conclude, based on the undisputed facts, that CNA did not commit the tort of bad faith because the law determining coverage was "fairly debatable" at the time CNA asserted its policy defenses. Finally, CNA is exempt from civil liability for any negligent provision of loss control services.

*By the Court.*—Order affirmed.