ELMER D. ANTELL v. PEARL ASSURANCE COMPANY, LTD.

89 N. W. (2d) 726.

April 3, 1958—No. 37,205.

*Thomas, Bradford, King & Collatz* and *John Jenswold,* for appellant.
*A. Blake MacDonald* and *Richard J. O'Brien,* for respondent.

NELSON, JUSTICE.
Elmer D. Antell brings this action to recover on a valued fire insurance policy written by defendant, Pearl Assurance Company, Ltd., insuring a house located in the Indian village of Onigum on the Leech

Lake Reservation in Minnesota. The trial court ordered judgment in plaintiff's favor for the amount of the policy, and this appeal follows from the court's order denying defendant's motion for a new trial.

Since the plaintiff prevailed in the court below, our recital of the facts will be presented in the light most favorable to his position as the prevailing party.

Plaintiff is a Chippewa Indian enrollee. He is past 56 years of age and three-eighths Indian blood and has been a resident of Minneapolis, Minnesota, since 1920. Prior to the time of trial he was engaged in selling real estate. Before becoming a real estate salesman, he had been employed with the World Tool & Engineering Company for several years. Plaintiff's brother-in-law, Rev. William B. Rice, had been a resident of Onigum for a number of years. While at the home of Rev. Rice in Onigum in late 1953, plaintiff became interested in acquiring a building located in Onigum, a 2½-story structure with dimensions of approximately 40 by 45 feet, commonly known as the Mercer House. Plaintiff had plans to use the building as a resort or lodge if he could move it to a suitable location in the vicinity. The Minnesota Chippewa Tribe owned the building but not the land upon which it was located.

The Minnesota Chippewa Tribe had at the time the following governmental structure: The tribe itself had its own constitution and by-laws and operated under a charter issued by the Secretary of the Interior. The governmental divisions of the tribe are known as bands. Each band operates under a charter issued under authority possessed by the Chippewa Tribe. The constitution provides that each district or band shall elect two members to act on a tribal executive committee, which is empowered to conduct the business of the tribe. Onigum village is a part of the Leech Lake Band. Under the charter issued by the Chippewa Tribe to the Leech Lake Band, it is authorized to organize its own tribal subdistricts. Four subdistricts were organized and one of these is entitled the Onigum subdistrict. Joe Vizenor occupied the position of manager of the Minnesota Chippewa Tribe and received his authority from the tribal executive committee. Joe Vizenor in whose office the tribal records were kept informed the plaintiff that the Mercer House among other buildings had been transferred to the Onigum Tribal Council, then the governing body of the Onigum subdistrict. It

appears that the transfer was made by the Federal government in 1940. Being so advised, plaintiff contacted officers of the Onigum Tribal Council, who at the time were Percy Lyons, chairman; Sara Lyons, treasurer; and Rev. Rice, acting secretary. Plaintiff met with the Onigum Council late in 1953, at which time he offered to purchase the house for $300, which offer the Onigum Tribal Council later accepted.

Three sets of minutes relating to a meeting of the Onigum Tribal Council held March 8, 1954, were received by the court and each set of minutes contained a statement to the effect that plaintiff had offered to purchase the house. The first set of minutes indicates that plaintiff offered $100 for an option to purchase the house. The second set of minutes states that plaintiff offered $300 as a total purchase price, $100 in advance as earnest money with balance upon approval and acceptance, and records the council's action in approving the offer. The third set of minutes contains the statement that plaintiff had deposited $100 in advance, as a downpayment, balance to be paid upon delivery of a bill of sale, and records the action of the council in approving the plaintiff's offer.

There was offered and received in evidence by the court a check for $100 dated February 11, which plaintiff testified he gave to the Onigum Tribal Council about February 11, 1954. It was marked on its face "Down payment on House." This check had been endorsed by Percy Lyons, as chairman, and Rev. William B. Rice, as acting secretary. Simultaneously with the delivery of the check the council delivered the keys to the building to plaintiff. At the time the keys were delivered to plaintiff weekly meetings were being held in the building by a government clinic. It was not otherwise being used.

During the time of these negotiations plaintiff was operating a restaurant at 307 University Avenue S. E., Minneapolis. He was carrying insurance at that time with the defendant insurance company. He had obtained said insurance through a Mr. Holmbeck who was an insurance broker. During the months of December 1953 and January 1954 plaintiff had informed Mr. Holmbeck, who would stop in at his restaurant from time to time, of his intentions to establish a lodge in the Leech Lake area, and that he expected to apply for a liquor license

in connection with establishing a resort business. He informed Mr. Holmbeck of his negotiations for the Mercer House and that he had bought it; that he was paying $300 for the house, but he made no suggestion to Holmbeck as to the insurable value. He did suggest that he thought the property ought to be insured for $16,000, and he furnished him with a picture. He then asked Mr. Holmbeck if he was going up there, and Mr. Holmbeck answered that he probably would, but he also added that he did not know whether one company would carry that much insurance. This statement by Mr. Holmbeck was made when they were talking about the amount of the insurance.

A fire insurance policy on the Mercer House was issued by the defendant insurance company February 18, 1954, in the form of a valued policy in the amount of $16,000. Mr. Holmbeck placed the insurable value at $20,000 and so entered it in the policy which he signed as agent. It is clear that Mr. Holmbeck who acted as agent for the Pearl Assurance Company, Ltd., did not personally inspect the property and he did not place an order to have the building examined by the Fire Inspection Bureau. It is undisputed that Mr. Holmbeck sold the insurance coverage to the plaintiff and that he became the agent of the defendant insurer in doing so.[1] The plaintiff paid the insurance premium in the amount of $149.40.

That an inspection was made by the Fire Inspection Bureau is undisputed. An inspection of the Mercer House was made by the Fire Inspection Bureau in June 1954 and following this report defendant insurer, due to a reported reduction in the premium rate by the Fire Inspection Bureau, refunded to the plaintiff $54.40 from the initial premium. It is only reasonable to infer that the inspection was made pursuant to notice from some reliable source that the building had recently been insured. The evidence does not permit the inference that the plaintiff ordered such inspection.

Plaintiff abandoned his plan to use the Mercer House for a lodge or as resort property. This was due largely to his having difficulty in obtaining a liquor license. He became interested in the manufacture of miniature basketball games and considered using it for that purpose.

---

[1]See, M. S. A. 65.05.

That plan was abandoned. Later in 1954 he contacted some contractors for estimates on the cost of moving the house to other land which the plaintiff could use for his own purposes. During the time the only activity carried on by plaintiff within the building was to enter it for the purpose of cleaning up the premises. January 8, 1955, plaintiff, assisted by two of his friends, began painting a section of the inside. The weather being cold, he installed a cast iron box stove making the necessary connection with the chimney. The rooms which he was painting had been used for a medical clinic. A stove had previously been used and connected with the same chimney. The next day plaintiff returned with his helpers to complete the painting. They built a fire in the stove for the second day and began painting operations during the noon hour. At 2:30 in the afternoon a neighbor informed plaintiff that the house was on fire. It was discovered in an area adjacent to the chimney. Residents of the village joined plaintiff in fighting the fire but means were not adequate in the village to combat it and the house burned to the ground in a couple of hours.

The plaintiff had not paid the balance of the purchase price when the fire occurred. He paid the balance later but received his bill of sale dated January 20, 1955, signed by Percy Lyons, as chairman, and Rev. William B. Rice, as secretary, for the Onigum Council of the Leech Lake Reservation. Percy Lyons testified that he was not the elected chairman of the council at the time of the execution and delivery of the bill of sale, but that the council had instructed him to execute the bill of sale as chairman since he occupied that position when the transaction was initiated in February 1954; that while Rev. Rice was not the elected secretary of the council, he had served as acting secretary for several years with council approval.

■ The paramount legal issue on this appeal seems to be whether, when the present Minnesota standard fire insurance policy is used, it is required that the insured have an insurable interest in the property at the time the policy is issued or if it is sufficient if such interest subsists at the time when the loss occurs.

M. S. A. 65.05 relates specifically to fire insurance companies and the issuance of fire insurance and reads in part as follows:

"Every company insuring any building or other structure against loss or damage by fire, lightning, or other hazard, by the issue of a policy or renewal of one theretofore issued, or otherwise, shall cause the structure to be previously examined, a full description thereof to be made, and its insurable value to be fixed, all by the insurer or his agent, and the amount thereof to be stated in the policy. In the absence of any change increasing the risk, without the consent of the insurer, of which the burden of proof shall be upon it, and in the absence of intentional fraud on the part of the insured, the whole amount mentioned in the policy or renewal upon which the insurer receives a premium, shall be paid in case of total loss, and in case of partial loss, the full amount thereof. * * * Every person who solicits insurance and procures an application therefor shall be held to be the agent of the party afterwards issuing insurance thereon or a renewal thereof."

Defendant contends that plaintiff did not possess an insurable interest in the Mercer House when the policy was issued. The trial court found that the plaintiff became possessed of an insurable interest on March 8, 1954, which subsisted at the time of the fire. March 8 was the date when his offer of purchase, accompanied by the downpayment, was approved and accepted. While the record indicates that the tribal council delivered the keys to the plaintiff and the possession with it about February 9, 1954, the trial court found that, up to March 8, 1954, plaintiff had only made an offer to buy which he could revoke if he chose to do so at any time prior to the acceptance of his offer.

Defendant relies in the main upon Culbertson v. Cox, 29 Minn. 309, 13 N. W. 177, and Womble v. Dubuque Fire & Marine Ins. Co. 310 Mass. 142, 37 N. E. (2d) 263, to support its contention that the insured must have an insurable interest at the time of the issuing of the policy. Neither of those cases dealt with our present Minnesota standard form of fire insurance policy, which has no requirement of sole and unconditional ownership of the insured. The policy with which we are concerned is not an unconditional-ownership policy but an insurable-interest policy. The Culbertson case arose under the old type of ownership policy which was in effect in Minnesota at the time. Mr. Justice Mitchell was deciding in that case who was entitled to the

insurance proceeds. The effectiveness of the contract was not in dispute and it was not necessary to consider the question of insurable interest. We do not agree that what may be said concerning an insurable interest in that case is controlling where the present Minnesota standard fire policy is in use or under the facts in the instant case. There is no requirement in the present Minnesota standard fire insurance policy that the insured must have sole and unconditional ownership of the insured property, and the Culbertson case is clearly distinguishable upon its own facts.

The Womble case is likewise distinguishable although the Massachusetts court in construing the policy in that case found for the plaintiff on this issue by a complicated equity theory, saying (310 Mass. 147, 37 N. E. [2d] 266):

"* * * The requirement of an insurable interest when the risk is assumed arose merely to prevent the use of insurance for illegitimate purposes. *It should not be extended beyond the reasons for it by excessively technical construction.*" (Italics supplied.)

A majority of the states have in recent years abolished the requirements for sole and unconditional ownership where they existed and changed their form of policies from an ownership to an insurable-interest policy in many respects similar to the Minnesota standard form. This change indicates a legislative intent that the excessive technical construction which the sole and unconditional ownership policy required had outlived its usefulness in the insurance field and therefore no more should be required in these times of modern industrial development and business expansion than an insurable interest in the property. Some states define insurable interest by statute.[2] Leading textwriters in the insurance field appear to express what we think the better view that, if during the existence of the risk and at the time of the loss the insured has an interest, he may recover although when the contract was made

---

[2]This change in the ownership clause of the standard fire policy has been discussed in "Insurable Interest in Property," Insurance L. J. 1949, p. 420, and by Godfrey, *Some Limited-Interest Problems,* 15 Laws and Contemporary Problems 415.

his interest had not yet attached.[3]

In Mark v. Liverpool & L. & G. Ins. Co. 159 Minn. 315, 322, 198 N. W. 1003, 1005, 38 A. L. R. 310, this court said:

"* * * The making of a contract for insurance or of present insurance is not a very formal matter. It is done every day by telephone. Insurance companies could not perform the efficient service which they now render if contracts could not be made quickly and without formality in accordance with prevailing business usages."

In Gershcow v. Homeland Ins. Co. 217 Minn. 568, 15 N. W. (2d) 88, we said that the terms of an insurance policy, when reasonably possible, must be so construed as to make effective the general insurance purpose.

1 Couch, Insurance, § 303, says:

"* * * there seems to be no good reason why one may not, in good faith, anticipate an interest in property and insure the same against fire so as to justify recovery, where an interest actually subsists during the term of the policy and at the time of loss."

In Haider v. St. Paul Fire & Marine Ins. Co. 67 Minn. 514, 520, 70 N. W. 805, 806, this court quoted the following from Miller v. Alliance Ins. Co. (C. C. S. D. N. Y.) 7 F. 649, 651:

"* * * So long as the plaintiff, under claim of right, had the exclusive use and enjoyment of the insured property without any assertion of an adverse right or interest in it by any other person, he was the owner of the property."

In Banner Laundry Co. v. Great Eastern Cas. Co. 148 Minn. 29, 34, 180 N. W. 997, 999, this court said, supporting the statement by numerous citations from texts and decisions from other jurisdictions, that:

"* * * The authorities all agree that it is not necessary that the in-

[3]See, 1 Couch, Insurance, § 303, and the following authorities cited therein: Henshaw v. Mutual Safety Ins. Co. 2 Blatchf. C. C. Rep. 99; Sun Ins. Office v. Merz, 64 N. J. L. 301, 303, 45 A. 785, 786, 52 L. R. A. 330, 338; 1 Phillips, Insurance (3 ed.) § 179; and 1 May, Insurance (3 ed.) § 100; see, also, 29 Am. Jur., Insurance, § 323; 44 C. J. S., Insurance, § 179.

sured should have an absolute right of property, and that he has an insurable interest if, by the destruction of the property, he will suffer a loss, whether he has or has not any title to, lien upon, or possession of the property itself."

In Nathan v. St. Paul Mutual Ins. Co. 243 Minn. 430, 431, 68 N. W. (2d) 385, 387, we recently held, following the Banner Laundry Co. case, that:

"It is not necessary that the insured have an absolute right of property in order to have an insurable interest. All that is necessary is that he will suffer a loss if the property is destroyed regardless of whether he has any title to, lien upon, or possession of the property itself."

Throughout the years courts of last resort have held that, if a fire insurance policy provides indemnity against losses upon property in some portion of which plaintiff then had no insurable interest, such contract constituted a wagering contract and therefore void as against public policy, such conclusions resting upon the premise that no insurable interest existed at the time of making the contract. It appears that a contrary view was always taken in construing life and marine insurance. It has also been held that a policy issued to a merchant to cover goods which it was expected he would acquire from time to time during the continuance of the policy constituted a valid contract; that a policy issued to a farmer covering not only the livestock then owned by him but that to be subsequently acquired during the term of the policy constituted a valid contract; and that likewise a policy issued to him upon crops not yet planted but which the parties expected to be grown before the expiration of the policy was unobjectionable. See, Sun Ins. Office v. Merz, 64 N. J. L. 301, 45 A. 785, 52 L. R. A. 330.

In the Sun Insurance case the court, in support of the conclusions which it finally reached, said that experience had taught that the necessities of business and the adequate protection of property required the same methods of insurance against loss by a fire as had always existed with relation to losses by the perils of the seas and that reflection had led to the conclusion that contracts of insurance upon property in which the insured had no interest at the time of the issuing of the

policy are not wagers if he acquires an interest during the life of the policy and retains it at the time when the loss occurs. The New Jersey court announced that, after an examination of the reasons upon which the earlier rule rested, it was led to the conclusion that those reasons were not well founded and that a contract by which the parties provided for indemnity against loss by fire upon property to be subsequently acquired by the party indemnified is not in any sense a gaming contract and void on that account. The court therefore held that, where an insurable interest subsists during the risk and at the time of the loss, it is sufficient to support a policy insuring against loss by fire.[4]

While the aforesaid question has remained largely an open one in this state, we incline toward the rule announced by the New Jersey court in the Sun Insurance case. We therefore, based upon the record before us in the instant case, now adopt the rule that, if a person has a reasonable prospect of becoming the owner of insurable property and in good faith takes out a policy of fire insurance thereon, and thereafter, before the loss occurs, acquires an insurable interest which subsists at the time of the loss, that policy is binding. Any decisions in this state holding to the contrary on that issue are hereby expressly overruled.

Another of defendant's contentions is that the Onigum Council did not have title to the building, was not the owner of it, and did not have an interest therein which it could transfer to the plaintiff, and further that, if the Onigum Council did have title to the Mercer House and had authority to sell and transfer title to it, such authority had not been properly exercised. Of course it is nowhere disputed that the house was

[4]The New Jersey court cited the following cases: Lane v. Maine Mutual Fire Ins. Co. 12 Me. 44, 28 Am. D. 150; Mills v. Farmers' Ins. Co. 37 Iowa 400; Sawyer v. Dodge County Mutual Ins. Co. 37 Wis. 503; Western & A. Pipe Lines v. Home Ins. Co. 145 Pa. 346, 22 A. 665; Wood v. Rutland & A. Mutual Fire Ins. Co. 31 Vt. 552; Hooper v. Hudson River Fire Ins. Co. 17 N. Y. 424; Hoffman v. Aetna Fire Ins. Co. 32 N. Y. 405, 88 Am. D. 337; Wolfe v. Security Fire Ins. Co. 39 N. Y. 49; Lee v. Howard Fire Ins. Co. 65 Mass. (11 Cush.) 324.

In Hooper v. Robinson, 98 U. S. 528, 25 L. ed. 219, the United States Supreme Court held that an insurable interest, subsisting during the risk and at the time of loss, is sufficient, and the assured need not also allege or prove that he was interested at the time of effecting the policy.

located on tribal lands and that tribal lands are owned by the Federal government but have been set aside by it for use by the Indian tribes, who have a right to the use and possession of such tribal lands but not the right to sell. They do not own an alienable title to the land.

Plaintiff called as a witness Bernard O. Angell, a lawyer who had been employed by the Interior Department for 35 years. It appears from his testimony that he was familiar with both the location and disposition of buildings located on tribal lands in the area. He testified that Federal buildings placed on reservations for Federal use were usually given to the tribe after Federal authorities had terminated their use of the structure; that these buildings were treated as personal property and that tribal councils or bands were considered proper authorities to dispose of such buildings in case of sale; that the constitution of the Chippewa Tribe provides that each reservation council, i.e., each council for a district such as the Leech Lake Band, has the authority to create land boards for the purpose of providing management for tribal lands.

Plaintiff contends that it is proper to take judicial notice of the fact that an Indian tribe does not handle its business affairs in the normal business manner; that the court in interpreting the rights of the Onigum Council must take into account the principle that those powers which are lawfully vested in an Indian tribe are not in general delegated powers granted by express acts of Congress, but are, rather, inherent powers of the sovereignty which have never been extinguished.[5] Plaintiff further contends that the Chippewa Indian Tribe has been recognized by the Federal government as a sovereign power; that what is not expressly limited by governmental authority remains within the domain of tribal sovereignty. In support of these contentions plaintiff cites In re Mayfield, 141 U. S. 107, 11 S. Ct. 939, 35 L. ed. 635; 24 Minn. L. Rev. 145; Worcester v. Georgia, 6 Pet. 515, 8 L. ed. 483; and Crabtree v. Madden (8 Cir.) 54 F. 426. A reading of these cases would indicate that the courts have held that acts of Congress which appear to limit the powers of an Indian tribe are not to be unduly extended by doubtful interference and that it is generally recognized in these decisions that questions as to the validity of the contracts among

---

[5]See, Cohen, Handbook of Federal Indian Law, p. 122.

members of the tribe are to be determined according to the laws and customs of the tribe.

It appears from documentary testimony introduced in the instant case that the Onigum Council was given the authority to handle its own buildings and property, and there was substantial evidence produced to show that many buildings in Onigum were purchased from the Onigum Council in the manner in which plaintiff's building was purchased.

On March 20, 1943, the Chippewa Tribal Executive Committee adopted resolution No. 17 amending the Chippewa Tribe land-management laws removing land-management authority from the Leech Lake Band and delegating it to the subdistricts. Plaintiff's exhibit J sets forth the land-management laws applicable to the Minnesota Chippewa Tribe. It appears that resolution No. 17 was adopted because the Leech Lake Band had failed to appoint a land board to administer tribal lands. As a result of that failure, the subdistrict, including Onigum, became vested with the authority to manage and administer the lands within their jurisdiction. It would seem only reasonable to infer that the tribal authority vested with land management was the proper authority to dispose of personal property located on tribal lands managed by that authority. There is evidence that the Mercer House was built by the tribe originally with tribal timbers and with tribal money; that it was then given to the United States Department of the Interior for use by the superintendent of the Onigum agency; and that the building was later abandoned by the superintendent and, if not otherwise disposed of, condemned to be torn down. There is likewise evidence from which it may be reasonably inferred that the Department of the Interior determined that the building could be of some use to the local tribe and gave it back to them. The record indicates that the government dropped the building from its records, and there appears to be no evidence that the government intended to hold any claim to it.

It should not be overlooked that the Federal government has, due to the unfamiliarity of the Indian with our laws, afforded him specific protection by statute in certain of his property rights. For instance, it has provided (25 USCA, § 194):

"In all trials about the right of property in which an Indian may be a party on one side, and a white person on the other, the burden of proof shall rest upon the white person, whenever the Indian shall make out a presumption of title in himself from the fact of previous possession or ownership."

When resolution No. 17 was introduced by the plaintiff, the court advised the attorneys that he would take judicial notice of it upon receipt of a certified copy. It appears from the files in this proceeding that, when the question of the admissibility of resolution No. 17 came up, the matter was presented to the trial court in defendant's memorandum and therein it may be found that one of defendant's counsel presenting the matter challenged the effect of this resolution but admitted the trial court's right to take judicial notice thereof.

The record affords no proof that there was any other owner of this building either before or after the fire. The defendant's own witness, William J. Morrell, testified that plaintiff would have to pay for the "dead horse" he purchased even if it burned. The aforesaid evidence and the other documentary evidence received we believe furnished the trial court with a sound basis for the exercise of its discretion in taking judicial notice of certain established customs, laws, and management procedures applicable to the Chippewa Indian Tribe and in reaching its conclusion that the Onigum Tribal Council was vested with the necessary authority to dispose of the Mercer House. The record would indicate that the court took judicial notice of Federal statutes and regulations.

Defendant contends that the court erred in denying its motion at the trial, after plaintiff had rested, to amend its answer. The original answer alleged "that the plaintiff attempted to defraud defendant in connection with said policy, the loss and the destruction of said insured premises both before and after the loss and that said policy, according to its terms, thereby became void." Defendant moved to substitute the allegation that "* * * the plaintiff, knowingly, falsely and fraudulently represented to the defendant that he was the owner of the building described in the complaint, * * *."

The defendant, under its original allegation of attempted fraud, cross-examined plaintiff relative to two previous fires on which he had

collected insurance. There was also a later attempt to show that Rev. Rice, the acting secretary for the Onigum council, had cashed plaintiff's downpayment check of $100 and failed to make proper disbursement of those funds to the tribal council. The court ruled that in the instant case the allegation of an attempt to defraud did not constitute a defense but that actual fraud might be a defense, that is, an affirmative defense, and it would have to be set up in the answer. The court also ruled that there had been no evidence establishing fraud. The motion to amend therefore did not constitute a proper motion to amend to conform to the proof. The court had the following colloquy with defense counsel:

"Court: You are not going to have any additional evidence of fraud other than what appears here now, is that right?

"Mr. Thomas: That is right, Your Honor, except I intend to prove that the policy—that the agent would have no authority to issue a policy upon a building which the plaintiff had no insurable interest in at the time of the issuance of the policy. That is my only additional evidence.

"Court: Well, there is no evidence from which the Court can find any fraud in obtaining the policy.

\* \* \* \* \*

"Court: I will deny the motion. It comes too late."

There was no abuse of discretion in the trial court's ruling on the motion to amend.

M. S. A. 60.85 reads as follows:

"No oral or written misrepresentation made by the assured, or in his behalf, in the negotiation of insurance, shall be deemed material, or defeat or avoid the policy, or prevent its attaching, unless made with intent to deceive and defraud, or unless the matter misrepresented increases the risk of loss."[6]

---

[6]In Romain v. Twin City Fire Ins. Co. 193 Minn. 1, 258 N. W. 289, this court held that § 60.85 applies to fire insurance as well as life and other insurance contracts. In Nathan v. St. Paul Mutual Ins. Co. 243 Minn. 430, 68 N. W. (2d) 385, we held that when both §§ 65.05 and 60.85 are applicable to the same fire insurance case the special provisions of

In Nathan v. St. Paul Mutual Ins. Co. 243 Minn. 430, 434, 68 N. W. (2d) 385, 389, we quoted with approval as follows from Insurance Co. v. Leslie, 47 Ohio St. 409, 417, 24 N. E. 1072, 1074, 9 L. R. A. 45, 48, which involved the construction of a valued-policy statute essentially the same as M. S. A. 65.05:

"*  *  * *And the statements in the application, of the value of the property, and its condition, in regard to which the company should have been informed by the examination the statute required it to make, were immaterial, upon which the insurer had no right to rely, and could not be fraudulent.*

"Nor do we think the operation of the statute can be defeated, by the neglect of the agent to make the examination, or fix the insurable value of the property, as it requires. The duty of the company is to obey the law, and its disregard of that duty can give it no greater rights than the observance of it would."

A review of our fire insurance cases in this state as well as other authorities indicates that the basic principle of a "valued policy" is that the parties to a fire insurance contract agree in advance on a valuation of the property to be insured, and, in the absence of fraud, this valuation is binding and not subject to judicial inquiry.[7]

In Aiple v. Boston Ins. Co. 92 Minn. 337, 100 N. W. 8, this court so construed the valued-policy statute as to safeguard the rights of both insurer and insured against fraudulent representations of value by requiring the insurer to inspect the property and to examine the structure as to value. Insurance companies therefore either do or ought to survey the property which they insure. Under those circumstances they ought not later to be heard to say that they were not familiar with the nature of the property, its ordinary use, and the manner in which it was kept. In addition thereto and in behalf of insurers an insurance rating bureau has been established in this state which is required to

§ 65.05 will prevail as an exception to the general provisions of § 60.85 where the two conflict.

[7]Romain v. Twin City Fire Ins. Co. 193 Minn. 1, 258 N. W. 289; Unton v. Liverpool, L. & G. Ins. Co. 166 Minn. 273, 207 N. W. 625; see, 9 Dunnell, Dig. (3 ed.) § 4803; 1 Couch, Insurance, § 74b.

and does survey the premises, and its knowledge of the significant factors of which the statute takes account may be presumed. Cement, Sand & Gravel Co. v. Agricultural Ins. Co. 225 Minn. 211, 30 N. W. (2d) 341. We said in the Nathan case that the evident purpose of § 65.05, in requiring the insurer to fix the insurable value of the property and also to previously examine the structure, is to give the insurer notice of the nature and use of the property and the condition of the premises, including the state of repair. If the insurer possesses itself of this knowledge, which the statute indicates it is required to do, such knowledge should enable the insurer to determine in accordance with the requirements of the statute the condition of the property with reference to its insurability, and, if the insurer chooses to insure the property, it will be assumed that it has made the necessary inquiry and a sufficient inspection to be able to value the property with reasonable accuracy. The legislative intent is clear that these requirements must be met by the insurer. Section 65.05, placing the burden of the aforesaid requirements upon the insurer, then provides that, in the absence of a "change increasing the risk" of loss without the insurer's consent, the whole amount of the policy is payable on a total loss. Thus, the insurer should know the nature and ordinary use of the structure in order to determine whether there actually was a change which increased the risk of loss.

Here, the trial court found that no statements or representations in writing had been made by the plaintiff prior to or at the time of the issuance of the policy; that he did not make any attempt to defraud the defendant either before or after the loss; and that he duly complied with all the provisions of the policy respecting the making of claim, furnishing proof of loss, and otherwise. In its memorandum the court said:

"It is true that the plaintiff will make a very large profit from this transaction, bordering on unjust enrichment, but this is an action-at-law on a contract freely and voluntarily entered into. The amount of the policy was the defendant's own suggestion, and it apparently was still satisfied after it caused an examination of the building to be made several months after the policy was issued, and long prior to the fire."

The trial court in its memorandum also indicated that it held the view that if a person had a reasonable prospect of becoming the owner, and in good faith took out a policy of insurance and thereafter and before the loss did acquire an insurable interest, the policy ought to be binding.

The burden is on the appellant to show that there is no substantial evidence reasonably tending to sustain the trial court's findings. If the evidence as a whole tends to support the findings they should not be disturbed. We have examined defendant's motion for amended findings and its numerous assignments of error by which it intended to present the questions which we have considered. To justify the reversal of a refusal to make amended findings, it is not enough to show that there was evidence to justify the proposed amended findings. The trial court's findings are entitled to the same weight as the verdict of a jury and will not be reversed on appeal unless they are manifestly and palpably contrary to the evidence, and such rule applies whether the appeal is from a judgment or from an order granting or denying a new trial.[8] We think that the findings of fact and the conclusions reached by the trial court find ample support in the record. We therefore conclude that the trial court's order denying the plaintiff's motion for amended findings or in the alternative for a new trial should be sustained.

Affirmed.

---

[8]Bolduc v. New York Fire Ins. Co. 244 Minn. 192, 69 N. W. (2d) 660; Prince v. Sonnesyn, 222 Minn. 528, 25 N. W. (2d) 468; Bicanic v. J. C. Campbell Co. 220 Minn. 107, 19 N. W. (2d) 7; Bang v. International Sisal Co. 212 Minn. 135, 4 N. W. (2d) 113, 141 A. L. R. 657; 1 Dunnell, Dig. (3 ed.) § 411, and cases cited.