TRAVELERS INDEMNITY COMPANY, a Corporation, Appellant,

v.

NATIONAL INDEMNITY COMPANY et al., Appellees.

No. 16670.

United States Court of Appeals Eighth Circuit.

June 29, 1961.

**216**

Benjamin M. Kail, St. Paul, Minn., Thomas J. Spence, St. Paul, Minn., on the brief, for appellant.

Irvin E. Schermer, of Schermer & Gensler, Minneapolis, Minn., for appellee, National Indemnity Co.

Frank X. Cronan, Minneapolis, Minn., Harold J. Carroll, Minneapolis, Minn., on brief, for appellee, Casualty Underwriters, Inc.

William L. Devitt, of Allen & Courtney, St. Paul, Minn., for appellee, Melvin J. Ryan, etc.

Charles T. Hvass, Minneapolis, Minn., for appellees, Richie Scott Olson, Lead Supplies, Inc., and George V. Thomas. Joseph L. Bard, Minneapolis, Minn., on brief for Lead Supplies, Inc., Walter E. Riordan, Minneapolis, Minn., on brief for appellee, George V. Thomas.

Before JOHNSEN, Chief Judge, and WOODROUGH and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

This declaratory judgment action was instituted in the United States District Court by National Indemnity Company (National) against Lead Supplies, Inc. (Lead Supplies), Melvin J. Ryan, Richie Scott Olson, Casualty Underwriters, Inc. (Casualty), George V. Thomas and Travelers Indemnity Company (Travelers) for the purpose of securing a declaration of the rights and liabilities of the parties by reason of the issuance of certain insurance policies by National, Casualty and Travelers. Diversity of citizenship and proper amount involved establish jurisdiction.

The litigation was precipitated when defendant Thomas was injured on June 3, 1958, as the result of a collision between his automobile and a certain 1954 Auto Car tractor and a Fruehauf trailer which were owned by defendant Ryan and operated by defendant Olson, the latter being at the time an employee of defendant Lead Supplies.

Ryan was engaged in business as a trucker, also leasing tractors and trailers to others. On December 17, 1957, Ryan leased to Lead Supplies a Mack tractor and a Fruehauf trailer. Later an Auto Car tractor was substituted for the Mack tractor. The written lease was effective for a period of one year subject to cancellation privileges; Lead Supplies was to furnish and pay the driver of the tractor, Ryan was to maintain the tractor and trailer and receive 20 cents for each mile they were operated. There was a provision in the instrument reading: "Property damage, public liability and cargo insurance carried by Lead Supplies, Inc."

As of December 18, 1957, National issued its "Combination Automobile Policy" to Ryan, effective for one year, on a 1950 Mack tractor and a 1950 Fruehauf trailer which on its face provided coverage for bodily injury liability with limits of $100,000 for each person and $300,000 for each accident, and property damage liability with limits of $10,000 for each accident. However, a "contingent liability endorsement" was attached to this policy which National claims exempts it from liability for the injuries sustained by Thomas.

Under date of January 25, 1958, Casualty issued a "standard combined automobile policy" effective for one year to Lead Supplies covering six passenger automobiles. Attached to this policy and a part thereof was a "hired automobiles" endorsement which was a subject of controversy in the trial.

Under date of November 7, 1957, Travelers issued a "comprehensive liability policy" effective for one year to Ryan, providing coverage for a fleet of tractors and trailers, including the Mack and Auto Car tractors, to which further reference will be made.

After trial Judge Nordbye, to whom the case was tried, filed a memorandum opinion, not officially published. The court determined that because of the contingent liability endorsement, National was not required to respond for the injuries and damages sustained by Thomas; that Casualty's policy issued to Lead Supplies covered the tractor-trailer unit involved in the Thomas collision, and that Travelers was liable under the policy it had issued to Ryan. The court did not, however, undertake to adjudicate and determine the liabilities as between Casualty and Travelers. Subsequently the court was advised that Thomas had obtained a judgment making it necessary that a determination be made of the liabilities of Casualty and Travelers, i. e., whether they were liable on a pro rata basis or whether the policy issued by

Casualty afforded only excess coverage or protection. This phase of the case received Judge Nordbye's careful consideration and he prepared and filed another memorandum opinion setting forth his reasons for concluding that Casualty's policy provided only excess insurance and coverage over the coverage afforded by the policy issued by Travelers.[1] Findings of fact and conclusions of law were subsequently filed and formal judgment was entered adjudicating that:

(1) None of the defendants was entitled to reformation of the policy issued by National to Ryan;

(2) National's policy did not cover the liability of Ryan, Lead Supplies or Olson to Thomas for the injuries and damages he sustained in the June 3, 1958 accident;

(3) The liability of Lead Supplies, Olson and Ryan to Thomas was covered by the policy issued by Travelers to Ryan;

(4) The liability of Ryan to Thomas for his injuries and damages was not covered by the policy issued by Casualty to Lead Supplies;

(5) The liability of Lead Supplies and Olson to Thomas was covered by Casualty's policy as excess insurance over the coverage provided them by the Travelers policy;

(6) As respects the liability of Lead Supplies, Olson and Ryan to Thomas, Travelers was directed to satisfy the judgment of Thomas to the extent of the limits of its policy without contribution by Casualty; after exhaustion of the limits of the coverage of the policy issued by Travelers, Casualty was obligated to make excess payment required to satisfy the remaining liability of Lead Supplies and Olson in connection with said accident and within the limits of the policy issued by Casualty.

On this appeal, taken only by Travelers, there are presented for our consideration and resolution three basic points which, in summary are: (1) National's policy should be reformed so as to afford coverage allegedly intended and for the pur-

1. This opinion is officially reported. See National Indemnity Co. v. Lead Supplies, D.C., 195 F.Supp. 249.

poses sought by the insured; (2) Casualty's policy with the "hired automobiles" endorsement attached, afforded coverage to the vehicles involved in the Thomas collision and Casualty should pay the whole or a pro rata share of the loss; (3) under the agreement, understanding and pattern of insurance dealings between Ryan and Travelers, it was not the intent of Ryan and Travelers to insure leased vehicles and Travelers' policy affords no coverage. These issues as well as numerous contentions of the parties in support and in opposition thereto are fully expanded in the many briefs that have been filed. There is unanimity among appellees on the issue of Travelers' liability, all of whom agree that the court's judgment in that respect should be affirmed.

## National's Liability

It is clear that the exposure of National under the conventional automobile policy which it issued to Ryan was materially narrowed by the contingent liability endorsement attached thereto, which reads:

"It is agreed that such insurance as is afforded by the policy for Bodily Injury Liability and Property Damage Liability applies subject to the following provisions:

"1. such insurance only applies to the named insured. [In this instance, Ryan].

"2. such insurance does not apply during such time as the named insured is operating, maintaining or using the automobile for or on behalf of any person or organization.

"3. such insurance does not apply during such time as the named insured is acting as an agent or employee of any person or organization.

"4. such insurance does not apply during such time as the automobile is used for transporting goods or merchandise.

"All other terms, conditions and agreements of the policy shall remain unchanged."

Since it was conceded that at the time of the collision with Thomas the tractor involved was being used for the purpose of transporting goods for Lead Supplies, the court concluded that the policy afforded protection to none of the parties insofar as the Thomas incident was concerned because of the provisions of § 4 of the contingent liability endorsement, supra. No one disputes the correctness of the trial court's interpretation of the effect of the endorsement. The question that was litigated and which is pursued on appeal, is whether the policy as issued expressed the real agreement between the parties thereto and afforded the coverage intended and for the purposes sought by the insured. In short, Travelers contends that Lead Supplies intended to procure comprehensive insurance on the leased vehicles, pursuant to provisions of the lease, but that the National policy, as issued, furnished only limited coverage to Ryan. This contention cannot be fully understood and appreciated without further elaboration of the facts and circumstances surrounding the application for and issuance of the policy.

At the time the lease agreement was made, Lead Supplies requested one Marvin E. Lestor, an insurance agent who had been servicing Lead Supplies' insurance needs since 1947 or 1948, to obtain liability insurance affording coverage on the leased equipment. On December 18, 1957, Lestor contacted Jessie Farquharson, an employee of Midway Insurance Agency, and requested that insurance be issued to cover the equipment in question. Jessie was not licensed as an agent or broker by any company, and Midway was not a licensed agent of National. As noted by Judge Nordbye, we find a rather sharp conflict in the testimony as to the type of insurance Lestor requested Jessie to obtain. According to Lestor, he gave Jessie full information and advised her he desired insurance for Lead Supplies during the time the leased equipment was transporting materials for it. Jessie's version was that Lestor told her about the lease arrangement and that she was told, or assumed, that insurance

was desired for "dead-head operations" to afford protection for Ryan when the equipment was not transporting materials for Lead Supplies. It is uncontroverted that Jessie contacted one Adella Haseley of the Northern States Agency, the general agent for National, and advised her that Ryan desired contingent liability insurance for the tractor-trailer outfit. After Lestor was informed of the premium cost of such insurance, he requested that a binder be issued as of that day. This was done by Northern States Agency, which furnished Jessie with an application blank; she in turn gave it to Lestor to be completed by Ryan, the owner of the equipment. The written application for the policy, signed by Ryan, does not specifically state that contingent liability protection was desired. However, it does reveal that the equipment to be covered was leased by Ryan to Lead Supplies and it contains this information: "They (Lead Supplies) furnish this insurance." The policy carrying a premium of $187.05, was issued and mailed directly to Lead Supplies at Lestor's request. Apparently the policy was never read or examined by Lestor or Lead Supplies. Lead Supplies paid the premium and the commission of 12½% was divided between Lestor, who received 10% and Midway States Agency, which received 2½%.[2]

The trial court, not attempting to resolve or reconcile the conflict between Lestor and Jessie with respect to the type of insurance actually requested, ruled the reformation question on the theory that neither Lestor nor Jessie Farquharson was an agent for National but were mere brokers so far as their relations with National were concerned; that Jessie was acting as agent for Mr. Lestor when she undertook to inform the Northern States Agency as to the type of insurance Mr. Lestor wanted, holding further,—

"The utter irreconcilability of the testimony of Mr. Lestor and Miss Farquharson as to the type of policy which National * * * should be requested to issue will not avail the parties who request reformation of the policy. There was no mistake on the part of the agents for National * * *. They provided the coverage requested. * * * The impelling answer to the request for reformation is that the Northern States Agency issued the type of policy that Miss Farquharson requested. Her negligence, or misunderstanding of the type of insurance requested by Mr. Lestor, if that has been established, cannot be imputed to National * * * or its agents."

Travelers takes issue with these findings and conclusions and urges that on undisputed facts Jessie and Lestor were, as a matter of law, acting as agents for National in procuring the policy and that any negligence, misunderstanding or mistake on their part is imputable to National so as to require reformation of the policy to provide the coverage intended.

Resolution of the issue of reformation brings into focus the status of Jessie Farquharson and her relationship to the parties with respect to the procuring of the policy of insurance from National. It cannot be gainsaid that unless Jessie was the agent of National the right to reform is without foundation and must fall.

▌ It may be stated as a general proposition that an insurance agent is a person expressly or impliedly authorized to represent an insurance company in dealing with third persons in matters relating to insurance. 29 Am.Jur., Insurance § 135; 44 C.J.S. Insurance § 137. An insurance broker is one who acts as a middleman between the insured and insurer and who solicits insurance from the public under no employment from any special company and who either places an order for insurance with a company selected by the insured, or, in the absence of such selection, with a company the

2. It appears that the premium for the comprehensive coverage alleged to have been intended was $991.62.

broker selects. Fredman v. Consolidated Fire & Marine Ins. Co., 104 Minn. 152, 116 N.W. 221, 223; Appleman, Insurance Law & Practice, Vol. 16, § 8726, pages 152, 153; 44 C.J.S. Insurance § 137; 29 Am.Jur., Insurance § 135. There is no ironclad rule or standard for determining whether an insurance broker represents the insurer or insured. The question cannot be answered absolutely and resolution thereof depends upon the circumstances of each case. Fredman v. Consolidated Fire & Marine Ins. Co., supra, 116 N.W. at page 223; Appleman, supra, Vol. 16, § 8727; 29 Am.Jur., Insurance § 139. Sound authority supports the proposition, however, that a broker is primarily the agent of the person who first employs him, and where he is employed to procure insurance, he is the agent of the person for whom the insurance is procured insofar as matters connected with the procurement are concerned. Unless there are special conditions or circumstances in the case, he is not the agent of the insurer, and he may not be converted into an agent for the insurance company without some action on the part of the company or the existence of some facts from which his authority to represent it as an agent may be fairly inferred. Appleman, supra, Vol. 16, §§ 8727, 8730, 8731; 44 C.J.S. Insurance § 140; 29 Am.Jur., Insurance § 139. Compare Gude v. Exchange Fire Ins. Co., 53 Minn. 220, 54 N.W. 1117; Fredman v. Consolidated Fire & Marine Ins. Co., supra, 116 N.W. 221; H & H Manufacturing Co. v. Cimarron Insurance Co., Mo.App., 302 S.W.2d 39, 43; Glaser v. Alexander, 247 Minn. 130, 76 N.W.2d 682.

◼ When tested by the foregoing general principles, we have no difficulty in determining that the trial court not only reached a permissible conclusion with respect to Jessie's status under Minnesota law,[3] but that the facts, when viewed logically and realistically, justify no other

result. All direct evidence on the subject was that she, as an employee of Midway Insurance Agency, was acting as a broker, and we find nothing in the attendant circumstances which affords proof that as such broker she was acting for and on behalf of National with respect to procurement of the policy from it. Much emphasis is placed by Travelers on the fact that National's agent, Northern States Agency, furnished Jessie with the application blank which was used to formally apply for the policy, as it had done on a limited number of prior occasions when Jessie placed business with National. We cannot accept the view that because of this circumstance National had thereby created Jessie as its agent for the purpose of soliciting insurance and binding it with respect to the issuance of policies. Particularly is this true in the absence of any evidence that National had ever expressly retained or requested either Jessie, her employer, Midway Insurance Agency, or Lestor to act as an agent in the procuring of insurance. Certainly, Jessie was not the moving or initiating force for procurement of the insurance, but Lestor, who was acting for Lead Supplies, searched out Jessie and ordered the insurance through her. While Travelers' legal theories are sound, the record furnishes no factual basis for holding National responsible for the mistake or misunderstanding, if any, between Jessie and Lestor. See and compare Fredman v. Consolidated Fire & Marine Ins. Co., supra, 116 N.W. 221; Glaser v. Alexander, supra, 76 N.W.2d 682.

◼ We have given consideration to Travelers' contention that by the provisions of § 65.05 Minn.Stat.Anno., there is no distinction made as to whether the solicitor is a broker or agent. This section forms a part of Chapter 65 of the Minnesota Code and relates to and deals with fire insurance companies. After providing for certain duties of fire insurance companies insuring against loss or

---

**3.** It has frequently been held by this Court that in a diversity case, governed by state law, the permissible conclusions of a trial court with respect to local law will not be reversed. See Texaco-Cities Service Pipe Line Co. v. Aetna Cas. & S. Co., 8 Cir., 283 F.2d 912, 915, and cases cited.

damage by fire, lightning or other hazard, the section concludes with this provision:

> "Every person who solicits insurance and procures an application therefor shall be held to be the agent of the party afterward issuing insurance thereon or a renewal thereof."

Obviously, on its face, this provision is not applicable here. It has been ruled by the Minnesota Supreme Court that "M. S.A. § 65.05 relates specifically to fire insurance companies and the issuance of fire insurance * * *." Antell v. Pearl Assurance Co., 252 Minn. 118, 89 N.W.2d 726, 730. We find nothing in Dose v. Insurance Co. of Pennsylvania, 206 Minn. 114, 287 N.W. 866, or in our opinion in Universal Underwriters Insurance Co. v. Kowalczyk, 8 Cir., 216 F.2d 120, which requires a different ruling.

Having demonstrated that National cannot be charged with the negligence or mistakes, if any, of either Lestor or Jessie, and that there was no misunderstanding on the part of National with respect to the type of coverage to be provided in the policy that was to be issued, it necessarily follows that reformation of the policy was properly denied. The law which controls the reformation of instruments is reviewed by the Supreme Court of Minnesota in Glaser v. Alexander, supra, 76 N.W.2d 682, at page 686, where, in restating the rule laid down in Farmers' Store of Wheaton v. Delaware Farmers' Mut. F. Ins. Co., 240 Minn. 170, 174, 59 N.W.2d 889, 892, the court observed:

> " 'Where the right of reformation is predicated upon mutual mistake and there is no evidence of fraud or inequitable conduct, the evidence to justify reformation must be clear, precise, and convincing * * *. It must establish that the instrument sought to be reformed fails to embody the actual agreement between the parties and that the failure in this respect was due to the mutual mistake of the parties rather than the unilateral mistake of one party. * * *.' "

Compare also Fredman v. Consolidated Fire & Marine Ins. Co., supra, 116 N.W. 221; Gude v. Exchange Fire Ins. Co., supra, 54 N.W. 1117; Jeske v. General Accident Fire & Life Assur. Corp., 1 Wis.2d 70, 83 N.W.2d 167.

Travelers also urges that National is estopped to deny coverage, upon the theory that it failed to make further investigation, or that it in some manner misled Lead Supplies or Ryan. Perhaps Lead Supplies' confidence in and reliance upon its agent Lestor was misplaced, but the short answer to this argument is that the policy issued by National was exactly the one requested by Jessie Farquharson. There was nothing in the written application sufficient to charge National with notice of Lead Supplies' intent in seeking coverage, and Travelers has failed to point out any evidence establishing that National in any way took action to mislead the parties. See and compare Gude v. Exchange Fire Ins. Co., supra, 54 N.W. 1117; Fredman v. Consolidated Fire & Marine Ins. Co., supra, 116 N.W. 221; Glaser v. Alexander, supra, 76 N.W.2d 682.

### Casualty's Liability

Basically, Casualty's trial position was that under its standard combined automobile policy issued to Lead Supplies which, as noted, covered a fleet of automobiles and hired automobiles, coverage was not extended to the tractor-trailer unit involved in the Thomas collision. The trial court, upon analysis of the terms of the hired car endorsement, and in light of other pertinent conditions of the policy and relevant facts, resolved this contention against Casualty but determined that the policy provided only excess coverage.

On appeal, Casualty has, in effect, abandoned the position pursued below and seeks to sustain the judgment on the theory adopted by the trial court. Thus, as to Casualty, we have the narrow issue of whether the policy only provided coverage in excess of Travelers' liability under the limits of its policy or whether

these two companies must share the loss on a pro rata basis.

To properly resolve this issue several clauses which appear in the Casualty and Travelers policies must be considered.

Paragraph 5 of the "Hired Automobiles" endorsement of the Casualty policy insuring Lead Supplies, provides:

"Other Insurance. This insurance shall be excess insurance over any other valid and collectible insurance for Bodily Injury Liability, for Property Damage Liability and for Automobile Medical Payments."

Under Paragraph 20 of "Conditions", the Casualty policy defined "other insurance" in this manner:

"Other Insurance—Coverages A, B, D, E, F, and G: If the insured has other insurance against a loss covered by this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss; * * *".

Travelers' policy issued to Ryan contained a "Truckmen Endorsement" which also contained an "other insurance", "excess insurance" clause. The trial court held this provision to be inapplicable, inasmuch as neither Olson nor Lead Supplies was engaged in the trucking business. The pertinent clause in the Travelers policy is to be found in the main body of the policy as Paragraph 14 of "Conditions". This typical "pro rata" clause provides:

"Other Insurance. If the insured has other insurance against a loss covered by this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to

the total applicable limit of liability of all valid and collectible insurance against such loss; * * *".

We understand Travelers' position to be that Lestor, the authorized agent for Casualty, intended the Casualty policy to cover the risk involved, and that knowledge of the agent being knowledge of the insurer, it was thus intended that the excess insurance clause in Casualty's policy should apply only if the insured Lead Supplies had itself purchased other insurance. To support this claim, Travelers relies solely on Bituminous Cas. Corp. v. Travelers Ins. Co., D.C.Minn., 122 F.Supp. 197, also tried to Judge Nordbye. Careful analysis of the holding in Bituminous, in light of distinguishing factual elements, convinces that it does not control.

The standards to be applied in resolving the liability of the respective companies are set to rest by the recent Minnesota cases of Eicher v. Universal Underwriters, 250 Minn. 7, 83 N.W.2d 895, and Woodrich Construction Co. v. Indemnity Ins. Co., 252 Minn. 86, 89 N.W.2d 412.[4] In the Woodrich case, after discussion of theories relied upon in prior cases, the court makes this pertinent pronouncement 89 N.W.2d at pages 420–421: "In determining the respective liabilities of insurance coverage in cases of overlapping coverage, the decision must rest upon a construction of the language employed by the respective insurers and not upon any so-called primary-tortfeasor doctrine or upon any other arbitrary rule or circumstance, * * *".

Application of this test satisfies us that the conclusion reached by the trial court with respect to Casualty's liability was proper. We find nothing ambiguous in the language of the two policies relating to other insurance or excess coverage. Casualty's liability insofar as the Thomas judgment is concerned, exists only because of the hired automobile en-

4. In the trial court and here the parties have proceeded on the theory that Minnesota law controls. For discussion of theories employed in various jurisdictions to solve problems presented by overlap-ping insurance, see note, "Automobile Liability Insurance—Effect of Double Coverage and 'Other Insurance' Clauses," 38 Minn.L.R. 838.

dorsement, but that same endorsement provides, in effect, that by reason of the existence of other insurance for bodily injury liability provided by the Travelers policy, Casualty is not obligated to pay until Travelers liability within the limits of its policy has been exhausted.

Neither was this excess insurance "other insurance" as that term is used in the pro rata clause of Travelers' policy above quoted and appearing as Paragraph 14 of "Conditions". In principle, the Eicher case, supra, is in point. There, the Supreme Court of Minnesota was confronted with a conflict between a "pro rata" clause appearing in one policy and an "excess" other insurance provision appearing in another clause. The holding there sustains the conclusion reached by Judge Nordbye and is in line with the great weight of authority prevailing in numerous jurisdictions. This is illustrated in Citizens Mutual Auto. Ins. Co. v. Liberty Mutual Ins. Co., 6 Cir., 273 F.2d 189 at pages 192–193, with these statements:

> "In each of the following cases it was held that when one automobile liability insurance policy provided for pro-rata coverage and a second provided for excess coverage in the case of non-owned vehicles, the excess clause was to be given its full effect: (Citing 16 cases from different jurisdictions). * * * In each of the following cases it was held that when an excess clause in one automobile liability insurance policy conflicted with another clause in a second policy the excess clause was to be given its natural meaning and applied only upon the exhaustion of the policy limits of the other policy. (Citing 14 cases) * * *."

As observed in Citizens Mutual, etc., supra, 273 F.2d at page 193, the courts have established the principle that "excess" insurance is not considered to be " 'other valid and collectible insurance' as the term was used in the Citizens Mutual policy." [5]

### Travelers' Liability

At the outset, it should be emphasized that Travelers' comprehensive liability policy by its terms covered the risk in question, not only as to Ryan, the named insured, but also as to Lead Supplies and Olson, who were additional insureds within the meaning of the "definition of insured" clause of the policy. This is conceded by Travelers, but it seeks to escape liability on the theory that the policy was modified, and that "under the agreement, understanding and pattern of insurance dealings between Ryan, the insured, and Travelers * * * it was neither the intent of Ryan nor Travelers to insure leased vehicles during the term of leasing under Travelers policies." This contention requires consideration of additional facts and circumstances.

Prior to the instant comprehensive policy, Travelers had issued to Ryan what is referred to as a "gross receipts policy" under which the premium was based on an annual audit of revenue derived from the insured's operations. One such policy was issued for the period of November 7, 1955 to November 7, 1956, another for the period of November 7, 1956 to November 7, 1957. When an audit was made after the expiration of each of the foregoing policies, a dispute arose—Ryan asserting that the claimed premium was based upon revenues derived from leased operations. In resolving this dispute, Travelers made an adjustment of the

5. In Citizens Mutual the double coverage arose from two policies, one insuring the lessor, the other the lessee of the vehicle. . The "other insurance" provisions in both were for all purposes identical—each carried a typical pro rata clause, with the proviso that only "excess coverage" liability was assumed in case of non-owned or hired vehicles. The Court gave full effect to the "excess coverage" proviso which appeared in the lessee's policy, concurrently holding that, as to the lessor's policy, its "excess" proviso had no effect since the vehicle was not "non-owned", and that, inasmuch as the excess coverage provided by the lessee's policy was not "other insurance" within the meaning of its pro rata clause, lessor's insurer was liable to the full limit of coverage.

premium shown by the audit to be due when it appeared that equipment of Ryan had been leased during all or part of the policy year.

The comprehensive policy in question here provided for a fixed premium to be charged for each unit insured. The final premium, however, was subject to an audit which was made by Travelers on June 18, 1959 (about a year after the Thomas accident). This audit fixed the premium in excess of $4200, and again there was a dispute, Ryan contending that the audit included premiums on vehicles that were under lease to Lead Supplies and to the Green Giant Company. In December, 1959, there was a re-audit by Travelers, which resulted in a lesser premium and in connection therewith, it appears that as to the equipment under lease to Green Giant, another of Ryan's lessees, Travelers suspended coverage of units under lease by appropriate written endorsement when it appeared that Green Giant, as lessee, had provided insurance for such other units. Affidavits to this effect were secured from Green Giant's insurer, but as to the equipment under lease to Lead Supplies, Travelers issued endorsements on November 3, 1959 (approximately a year after the policy had expired and about 17 months after Thomas was injured) suspending coverage on the Auto Car tractor and Fruehauf trailer retroactive to May 19, 1958 and December 17, 1957, respectively. Ryan refused to accept this re-audit or to pay the revised premium because of the pendency of this litigation, and the trial court found that Ryan had never expressly accepted the endorsement of November 3, 1959, retroactively suspending coverage on the units involved in the accident. It is an uncontroverted fact that Ryan had advised Travelers' agent in December 1957 of the lease agreement with Lead Supplies although he failed to furnish a copy of this lease, and that he subsequently advised the company of the substitution of the Auto Car unit for the Mack tractor

originally designated as insured equipment.

We are in agreement with the trial court's finding that it was Travelers' policy to waive premiums on leased vehicles if the lessee carried liability insurance, but that neither Travelers nor Ryan intended that the Mack tractor, Auto Car tractor or Fruehauf trailer should be without insurance coverage in view of the Minnesota laws as to an owner's liability in case of an accident.

Travelers relies upon the general principle that an insurance policy, like other written contracts, may, by mutual consent of the parties, be modified, that consent may be inferred from conduct of the parties, Shake v. Westchester Fire Ins. Co., 158 Minn. 40, 196 N.W. 804, and that unless otherwise provided by statute or by the contract of insurance, a modification may be made by oral agreement. Jeske v. General Accident Fire & Life Assur. Corp., 1 Wis.2d 70, 83 N.W.2d 167, 177; 29 Am.Jur., Insurance § 335; 44 C.J.S. Insurance § 281. However, it is equally well settled in Minnesota that a parol modification of a written instrument must be established by clear and convincing evidence. See Kavanagh v. The Golden Rule, 226 Minn. 510, 33 N.W. 2d 697, 700, and cases cited.

The finding by the court, upon substantial evidence, that the contract was not in fact modified by the parties, is a complete answer to Travelers' theory of no liability. Travelers' insistence that there was no coverage of the vehicle involved in the occurrence which resulted in a judgment for Thomas, indicates a refusal on its part to recognize the purport and effect of the understanding and agreement between Ryan and Travelers, which was never intended to deprive Ryan of insurance coverage of vehicles which his lessees were operating. The key factor motivating a later adjustment of premiums was the presence of duplicate insurance.[6] This was a premium-paying ar-

---

6. This is clearly reflected by a letter from Travelers' agent to Green Giant Company requesting a "Certificate of Insurance"

on vehicles leased by them, "as that will relieve [Ryan] of being charged this additional premium."

rangement designed solely to relieve Ryan from additional premiums on vehicles under lease when it was ascertained, after the policy had by its terms expired, that such leased vehicles were in fact insured by the lessee against bodily injuries and property damage, so that Ryan, in case of an accident, would not be exposed to payment of a claim. This method of procedure was entirely consistent with policy provisions under which Travelers was permitted to examine and audit the insured's books and records at any time during the policy period and within three years after the final termination of the policy for the purpose of determining the earned premium that was due. The claim that the policy did not insure the leased vehicles is contrary to its clear language and flies in the teeth of the declaration that "*   *   * this policy embodies all agreements existing between himself [Ryan] and the company or any of its agents relating to this insurance."

Although Travelers was advised as early as December, 1957, that equipment covering the policy had been leased to Lead Supplies and further advised in May, 1958, that the Auto Car tractor had been substituted for the Mack tractor, it failed to take action at that time to modify the coverage provisions of the policy, which it could have effectively accomplished through the simple expedient of a written endorsement embodying the terms of the agreement now contended for. This procedure was not resorted to until long after June 3, 1958, the date of the accident when rights of other parties came into existence. The attempt in November, 1959 retroactively to modify the contract by suspending coverage of the involved tractor was without legal effect. See Spann v. Commercial Standard Ins. Co. of Dallas, Tex., 8 Cir., 82 F.2d 593, 599, and Goldstein v. Bernstein, 315 Mass. 329, 52 N.E.2d 559, 561, where this pertinent pronouncement was made:

> "After a cause of action has accrued to the injured persons against the insured, then the parties to the contract of insurance cannot by any release, agreement or collusion de-

stroy the rights of the injured persons in the indemnity. (Citing cases.)"

We are fully convinced that the trial court properly resolved the numerous and complex issues that were litigated, and the judgment is in all respects

Affirmed.