SOVEREIGN LIFE INSURANCE COM-
PANY OF CALIFORNIA, Plaintiff,

v.

Ronald Ray REWALD, Nancy Imp Re-
wald, Russell Duk Chun Kim, Trustee
Under the Ronald Rewald Trust Agree-
ment of October 27, 1980, and Reynaldo
D. Graulty, Trustee of Bishop, Baldwin,
Rewald, Dillingham & Wong, Inc., De-
fendants.

Civ. No. 83-0975.

United States District Court,
D. Hawaii.

Feb. 6, 1985.

Cades, Shutte, Fleming & Wright, Jef-
frey S. Portnoy, Honolulu, Hawaii, for
plaintiff.

Robert A. Smith, Honolulu, Hawaii, for
Ronald Ray Rewald and Nancy Imp Re-
wald.

Russell D.C. Kim, Honolulu, Hawaii, pro
se.

James A. Wagner, Honolulu, Hawaii, for
Reynaldo D. Graulty.

DECISION

PENCE, Senior District Judge.

*Facts*

On September 2, 1980, plaintiff Sover-
eign Life Insurance Company received
from defendant Ronald Rewald an applica-
tion for a $2,000,000 life insurance policy
which listed as beneficiaries his wife, de-
fendant Nancy Imp Rewald, and their chil-
dren. The application required Mr. Rewald
to answer questions concerning, among
other matters, his health, occupation, and
financial background. Allen Tetzlaff, a
Wisconsin insurance agent who had han-
dled Rewald's insurance affairs previously
and had solicited this and other insurance
applications from him, apparently filled out
the application over Rewald's previously
affixed signature. Rewald's signature,
however, appeared under a clause repre-
senting to Sovereign that all of the an-
swers to these questions were true and
complete.

Before issuing the policy, Sovereign re-
quired Equifax Services, a credit investiga-
tion agency, to interview Rewald and oth-
ers and to consult records in order to inves-
tigate Rewald's background and verify the
information contained on the application.
Among the representations which Rewald

made in his application or in the credit investigation were the following:

1. His occupation was vice-president of Bishop, Baldwin, Rewald, Dillingham & Wong.

2. This company was a large, established Hawaii investment consulting firm with very substantial business dealings in the mainland United States and in the Far East, including Hong Kong, Japan, Taiwan, the Philippines, and Tahiti.

3. Rewald moved to Hawaii in 1973 and had since been an investment consultant with Bishop, Baldwin.

4. Rewald worked for CMI Investment Corporation in Wisconsin approximately from 1963 to 1973 and was owner and president of College Athletic Supply Company there from 1965 to 1973, when he sold the business and moved to Hawaii.

5. Save for traffic infractions, he had never been charged with or convicted of violating the law.

6. His net worth was $2,017,545.17.

Sovereign issued policy 115077 on Rewald's life for $2,000,000 on September 14, 1981.

Sovereign received from Rewald a second signed application on November 9, 1982, this time for a $1,000,000 policy, naming his wife as sole beneficiary. Rewald made identical representations as to the truth and completeness of his answers. On the application, and in response to a second credit investigation by Equifax, Sovereign received representations similar to those described above. This time, the company was told that since the first application, Rewald's net worth had risen from $2,017,-545.17 to $6,597,500.00.

Sovereign accepted this second application on March 17, 1983, issuing policy 150539 on Rewald's life for $1,000,000.

On the afternoon of July 29, 1983, Rewald disappeared from his luxurious Bishop, Baldwin office suite and registered at the Sheraton Waikiki Hotel. That evening, upon witnessing a television news report that he and his firm were being investigat-ed for investment fraud by the Internal Revenue Service, the Securities and Exchange Commission, the Federal Deposit Insurance Corporation, the Hawaii Department of Consumer Affairs, and the Federal Bureau of Investigation, Rewald slit his arms in his hotel bathtub. Discovered by a hotel employee, he survived to be arrested when he emerged from the hospital.

Several investors immediately forced the firm into involuntary bankruptcy proceedings. Within a few days, the court-appointed trustee announced that the firm's assets of over twenty million dollars were gone. At least nine lawsuits arising out of these facts have been filed, including this action.

The press reported that Bishop, Baldwin had taken in well over twenty million dollars from its clients, yet had invested hardly any of it. Instead, Rewald was suspected of having operated a classic "Ponzi scheme" by promising investors exorbitant rates of interest and then paying them with funds from new investors. He reportedly used many millions of dollars to support an extravagant lifestyle. This included an estate, a huge collection of valuable art, a ranch, condominiums, a private tutor for his children, an extensive collection of expensive automobiles, a large stable of polo ponies and a second ranch on which to stable them.

Additionally, there were persistent media reports that Rewald claimed to be an undercover agent of the Central Intelligence Agency, and that the Agency was involved in Bishop, Baldwin.

On September 9, 1983, Robert A. Smith, Rewald's attorney, wrote to Sovereign as follows:

The reason for this letter is that upon the occurrence of this event—namely, arriving at a point where, even though the defense [1] exists to be pursued, we cannot pursue it for lack of funds—Mr. Rewald will *take his own life*. I say this to a moral certainty, for I know that he is absolutely committed to doing so when the point is reached that legal effort to

---

1. To criminal and civil actions.

defend him must be abandoned. Given the freeze order on his personal assets, and given, further, the total lack of ability to finance any defense because of the freeze order, suicide is the only way, he feels, that he can ever provide for his wife and five children. He has confirmed to me in certain terms his intention to do so, and I have no doubt whatsoever about his sincerity.

Therefore I have a proposition to make to you which, at first blush, you may find bizzare [sic]; however, my hope is that upon reflection, you can see its merit. I believe that very shortly you will be facing a claim, based upon Mr. Rewald's suicide, of the full amount of your policies ... My proposition is this: if the two insurance companies, Northwestern with which Rewald also carried life insurance, will agree to fund Mr. Rewald's defense, both civil and criminal, then I believe that this offers the best opportunity and chance for the insurance companies to avoid having to pay some $5.25 million dollars. I would estimate that the cost of such defense (both civil and criminal) would be between $300,000 and $500,000. This would mean an expenditure by each carrier of from $150,000 to $250,000 apiece. In addition to or as a part of such fund, some sort of arrangement should be made for a monthly allotment for Mr. Rewald's wife and five children [sic] family.[2]

The letter concludes: "My hope is that the proposal contained in this letter makes ultimate economic sense and that I will hear from you shortly." [3]

Smith did hear shortly from Sovereign. On September 13, 1983, four days after the date of the letter, and one day before its first policy would have become incontestable, Sovereign sued in this court to void both policies for alleged misrepresentations by Rewald. Sovereign sets out the following facts.

Rewald began work as a salesman for College Athletic Supply Company in 1963. Several years later, the company, then run by Rewald, began to lose money. Rewald attempted to sell a franchise of the company in violation of Wisconsin law. He plea-bargained the charges down to one felony count of petty theft, a violation of Wis.Stat. section 943.20(1)(a), and, on August 10, 1976, was sentenced to 60 days in prison (eventually suspended), $2,000 restitution, and a year's probation. College Athletic Supply and Rewald both went bankrupt.

CMI Investment did not exist in 1963. It began only in the late 1970s.

Contrary to the representations in his Equifax reports, Rewald was not living in Hawaii or working at Bishop, Baldwin from 1973 on. He moved to Hawaii in 1976.

In 1976, Rewald shared a one-third interest as a consultant with two other partners in Hawaiian Pacific Sports. After the company encountered financial difficulties, the other two partners abandoned it, and it was dissolved.

Rewald incorporated Bishop, Baldwin, Rewald, Dillingham & Wong in Hawaii on October 11, 1978. In fact, the corporation had no one named Bishop, or Baldwin, or Dillingham in it, and never had.[4]

The Equifax credit agency stated in its report to Sovereign on Rewald's second life insurance application that he had a net worth of $6,597,500. Giving dates, the report states that its investigators interviewed him twice, and that they "obtained the necessary information from the applicant," during an interview. The investigators stated that among the sources they consulted for confirmation of Rewald's representations to them were his financial statement "on various appraisals and busi-

**2.** Letter from Robert A. Smith to Burt Bernstein, Vice President, Underwriter's Claims Section 79, Sovereign Life Insurance Co., September 9, 1983 (Exhibit G to Plaintiff's Motion for Summary Judgment), at 4–5.

**3.** *Id.* at 6.

**4.** These are three of the oldest, best-established, and wealthiest *kamaaina* (longtime resident) names in Hawaii, dating from the days of the first American merchant and missionary settlers.

ness [sic]," and Sun Lin "Sunny" Wong, president of Bishop, Baldwin.

Rewald later testified that his net worth had actually been nowhere near the amount contained in the credit report. He denied ever having been interviewed.[5]

As of December 31, 1981, the firm's capitalization was listed in its annual corporation exhibit as $1,000, the same as it was at incorporation. Rewald's stated net worth, however, was over two million dollars at the beginning of 1981 (first Equifax credit report, January 7, 1981), and had mushroomed to over six and one-half million dollars as of the close of 1982.

The report also states that Rewald owned real estate assets worth $8,850,000. When asked how the investigators obtained this datum, Rewald replied, "I do not have the foggiest idea."

Rewald had apparently achieved unbelievable personal success after his undisclosed 1976 bankruptcy. To the credit investigators, he attributed this success to real estate ventures, yet he later testified that by this time (1982), he had sold but one parcel of land, containing his first home in Hawaii, for $120,000.

This court has held that Rewald's personal assets, used to support his extravagant lifestyle, actually were drawn from the funds invested in Bishop, Baldwin. The court placed a constructive trust over Re-

wald's personal assets to help pay off his firm's investors. *In the Matter of Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*, Bk. No. 83–00381; *Hayes v. Rewald*, Adv. No. 83–0181 (D.Hawaii, August 9, 1984).

Sovereign moved for summary judgment. No memorandum in opposition was filed, and no one appeared to represent Rewald at the hearing on this motion, November 29, 1984. Smith is still Rewald's attorney of record in this case. Smith was served with the motion papers in Honolulu, and Rewald was also served in care of the San Francisco offices of Melvin Belli, his new attorney in several other cases. No substitution of counsel form was filed. On July 11, 1984, this court denied Smith's motion to withdraw from the case and to let Rewald proceed *pro se.*

*Applicable Law*

■ In this diversity suit, the forum state's law controls. *Erie v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In Hawaii, the forfeiture of an insurance policy is disfavored unless it is shown that the insured seriously breached a duty owed to the insurer, as by defrauding the latter. *Colburn v. U.S. Fidelity and Guaranty Co.*, 25 Haw. 536, 543 (1920).

The controlling state statute, H.R.S. section 431–419 (1976), reads as follows:

---

5. The following exchange took place between Jeffrey S. Portnoy, Sovereign's attorney, and Rewald:

Q. When you moved to Honolulu, did you make a decision that you would not tell anyone about your bankruptcy in Wisconsin and the criminal charges and conviction that you had in Wisconsin?

A. I certainly didn't make a decision that I wouldn't tell anyone. It isn't something that likely would come up and I wouldn't volunteer it, sit around bars talking about the old days when I was convicted of a misdemeanor.

    \*    \*    \*    \*    \*    \*

Q. If somebody had said to you, "Have you ever been arrested?" what would you have said?

A. In what possible context could someone ask me a question like that?

Q. You were supposed to have been asked that question in the context of obtaining life insurance.

A. I know I wasn't asked a question like that and I would not have put myself in a position where I could have been asked a question like that.

Q. You had no idea what the requirements were for obtaining $3 million worth of life insurance?

A. I signed the forms and told the agent I want it, and that's all I [sic] ever done in acquiring any life insurance ever, you know.

    \*    \*    \*    \*    \*    \*

Q. It would not be in your usual practice to have met with somebody wanting to interview you for a life insurance policy?

A. It would have been something avoided at all cost.

Q. ... [Y]ou probably would not have given them the opportunity to ask you these questions?

A. I can't believe that I would have.

Warranties, misrepresentations in applications. All statements or descriptions in any application for an insurance policy or in negotiations therefor, by or in behalf of the insured, shall be deemed to be representations and not warranties. A misrepresentation, unless it was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer, shall not prevent a recovery on the policy.

*Analysis*

*I. The representations*

■ The statements which Tetzlaff may have written into Rewald's applications over the latter's signature constituted misrepresentations by the insured just as though Rewald himself had spoken or written them. Rewald cannot escape the effect of these misrepresentations merely because he may have signed the applications in blank and given them to the agent to fill out. Even if Tetzlaff did not fill in the forms with statements given him by Rewald, he was still Rewald's agent. Rewald testified that he signed blank applications of several insurance companies, sent him by Tetzlaff, and instructed the latter to find him the best deal. Even if Tetzlaff, as the agent of Rewald, had known of the falsity of the representations, that knowledge still could not be imputed to Sovereign. *Travelers Indemnity Co. v. National Indemnity Co.*, 292 F.2d 214 (8th Cir. 1961).

Entirely apart from the agency relationship between himself and Tetzlaff, Rewald also had a duty to read the insurance applications before they went to Sovereign. Rewald could not totally abandon his responsibility to see that his applications told the truth.

Rewald's denials that he remembers ever being interviewed by the Equifax credit agents or giving them any information or documents to support his insurance applications, or his protestations that he had no idea how they came by the information in the credit reports, do not suffice to raise a material issue of fact. The documentation

in the credit reports submitted to this court as exhibits to the instant motion and referred to above make plain that there is no genuine issue as to whether Rewald supplied Equifax with the information, or caused it to be supplied.

*II. Falsity of the representations*

■ Rewald's deposition testimony alone disposes of Hawaii's second statutory requirement. As cited above, Rewald admitted the truth of numerous facts about his unsuccessful business history, his conviction for petty theft by fraud, his residence, occupation, income, net worth, and other matters, which differed dramatically from the statements on his insurance applications and in the credit reports. The deposition testimony is confirmed by documentation, including copies of bankruptcy and criminal court records and of the Bishop, Baldwin articles of incorporation.

Thus, Sovereign conclusively has fulfilled its burden of showing that the insured made materially false representations to the insurer.

*III. Materiality of the representations*

The issue here is whether, had Sovereign known the truth about Rewald, it would have insured his life for $3,000,000.

As stated, Rewald depicted himself as a fabulously successful and wealthy investment consultant whose large, established firm had invested many millions of dollars in business ventures worldwide. In truth, there were no such investments. The records show that Rewald spent his clients' millions in luxury living, his sixteen cars, a "million dollar" home, two ranches, polo ponies, art collection, and other amenities, as well as on exorbitant dividend payments to earlier investors. As set forth above, he had also experienced business and personal bankruptcy, and had been charged with fraudulently selling a franchise and pled guilty to petty theft—all of which he concealed from Sovereign.

Sovereign's vice president of underwriting, Burt Bernstein, represents in an affidavit:

4. Upon learning of the suicide attempt by Defendant Ronald Ray Rewald, Sovereign conducted an investigation in good faith of Defendant's background.

5. Had I known the truth about Defendant's background, including his prior criminal record, his personal bankruptcy, his employment with the CIA, his actual financial net worth, the nature and financial solvency of Bishop, Baldwin, Rewald, Dillingham & Wong, and other facts misrepresented in his applications for insurance at the time of deciding on his insurability, I would not have caused Sovereign to issue policy nos. 115077 and 150539.[6]

While misrepresentations as to net worth, past business history, and fraud charges are not, per se, related to the insured's life expectancy, nevertheless, in situations such as found here, they can "materially affect[ed] the acceptance of the risk. H.R.S. 431–419, *supra.*

As indicated in the one case cited by Sovereign, *Valton v. National Fund Life Assurance Co.,* 20 N.Y. 32 (1859), "[t]he pecuniary considerations of the insured may be material to the estimation of the risk...." In *Valton,* two business partners took out a $10,000 policy on the life of their porter. They told the insurance agent in the porter's presence, however, that he was actually their partner. Despite having spotted the proposed insured on the steps of the business establishment in question, dressed in a green apron and sweeping up, the agent believed them. The court stated, *id.* at 38,

> It is clear that the circumstance of a party being engaged in commercial business, possessed of large means, might induce an insurer to make an insurance upon his life for a large amount, while were he a mere porter the risk would be rejected, although the chance of life would be as good in the latter situation as the former.

The court held, then, that the misrepresentation was not material to the risk as-

sumed, but rather to the decision to insure the risk.

When there is a gross imbalance between the size of the insurance policy sought and the financial condition of the applicant, obviously the insurer questions immediately the applicant's motive for securing the policy. Here, a reasonably prudent underwriter would immediately suspect that Rewald wished such large insurance in order that his wife might cash in on the same in case of his early death from any cause. It must be noted that here, Rewald did attempt suicide after his investment scheme collapsed. Rewald's misrepresentations were very material to the risk which Sovereign was undertaking. It is not necessary for this court to rule upon Sovereign's additional contentions about Rewald's concealment of his CIA connections and misrepresentations as to the purpose and frequency of his foreign travel.

Although Rewald, in his deposition, stated that he avoided filling out his application, avoided granting interviews (although credit reports based on such interviews form part of the record herein), and failed to inspect his applications for their accuracy, nevertheless, he is bound by them on their face, and from his deposition testimony, there results a conclusive inference that he made them with an intent to deceive Sovereign. In any event, the record conclusively shows that Rewald's misrepresentations were material to the acceptance of the risk by Sovereign.

Sovereign had no inkling that any of the statements in Rewald's applications or credit reports were false. A search through business and court records in Hawaii from 1973 through 1976 when Rewald, contrary to that which he told the credit agency, was actually living in Wisconsin, would have failed to reveal his Wisconsin financial failures or criminal record. Sovereign reasonably relied upon Rewald's misrepresentations in acceptance of the risk of insuring his life and was deceived by Rewald into so doing. Enforcement of the two policies would be inequitable.

**6.** Affidavit of Burt Bernstein, supporting plaintiff's motion for summary judgment, at 2.

*Conclusion*

Sovereign has met its burden of showing that the statutory requisites for voiding Rewald's life insurance policies are fulfilled. The insured made certain false and deliberate deceptive representations on the applications and to the credit investigators to induce the insurer to issue the policies, and some of those false and deceptive representations materially affected Sovereign's decision to accept the risk.

Therefore, IT IS HEREBY ORDERED that Sovereign's Motion for Summary Judgment under Rule 56 of the Federal Rules of Civil Procedure is GRANTED.